# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

BRIAN DAVID JOHNSEN,
Defendant and Appellant.

S040704

Stanislaus County Superior Court
R239682

February 1, 2021

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, Groban and Ikola* concurred.

---

*     Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. JOHNSEN

S040704

Opinion of the Court by Liu, J.

A jury convicted defendant Brian David Johnsen of first degree murder (Pen. Code, § 187; all undesignated statutory references are to the Penal Code), attempted murder (§ 664), two counts of robbery (§ 212.5), three counts of burglary (§ 459), and five counts of solicitation to commit murder (§ 653f). The jury found true the special circumstances that Johnsen murdered Juanita Bragg during a robbery and a burglary. (§ 190.2, subd. (a)(17)(A), (G).) The jury also found true that the murder was perpetrated by personal use of a deadly weapon (§ 12022, subd. (b)) and that the attempted murder count was committed with personal use of a deadly weapon and resulted in great bodily injury (§§ 12022, subd. (b), 12022.7). At the close of the penalty phase, the jury returned a verdict of death. Johnsen moved for a new trial and to modify his sentence to life without the possibility of parole. (§ 190.4, subd. (e).) The trial court denied these motions and sentenced Johnsen to death. Johnsen's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS AND BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Case

Sylvia Rudy lived alone in a residential complex owned by her employer. Johnsen and his mother lived in the duplex just behind Rudy's home. There were openings on each side of the

1

fenced patio area of Johnsen's home, which allowed for unimpeded access to Rudy's home.

### (a) September 3, 1991

Rudy went to work in the morning. During lunchtime, Rudy returned home to cash a check for her adult daughter, leaving the cash on Rudy's dining room table before returning to work. Around 3:00 p.m., Rudy's daughter arrived at Rudy's home to discover the front door wide open and the cash on the table missing. When Rudy came home, she found a large hole in the glass window of her back bedroom. Her VCR and her jewelry, which Rudy kept in her bedroom dresser, were missing.

### (b) February 15, 1992

Around 10:00 a.m. on February 15, Johnsen called his friend, Mickey Landrum, to ask him to come to Johnsen's house and help move a television set. Landrum arrived around 2:30 p.m., at which point Johnsen drew Landrum's attention to the television located inside Rudy's home. Landrum refused to help steal Rudy's television. Johnsen then showed Landrum various items he had taken from Rudy's home, including a microwave, boom box, portable bar, china plates, and jewelry. Johnsen informed Landrum he had broken into Rudy's home before. Either at that time or a few days later, Johnsen also showed Landrum 10 keys attached to a key ring he had taken from Rudy's home, one of which Johnsen surmised was Rudy's home key.

When Rudy returned home for the day, she noticed that her microwave and china plates were missing. She also noticed that the window in her back bedroom was broken. Rudy later realized that her liquor, boom box, and answering machine were

missing.  Her portable bar, camera, spare car keys, and spare front door key were also missing.

Rudy attempted to call 911 from her kitchen telephone, but the phone's internal components had been disassembled.  She then tried to call 911 from the combination clock-radio-telephone in her bedroom, but it was missing.

### (c)  February 18–19, 1992

On February 18, Landrum spent the night at Johnsen's house, where he and Johnsen drank, smoked pot, and snorted "crank" (i.e., crystal methamphetamine) together.  On the morning of February 19, a Modesto Police Department detective arrived at Johnsen's home and took Johnsen in for questioning for an unrelated matter.  At Johnsen's insistence, the detective allowed Landrum to stay at the residence.

Shortly thereafter, Landrum received a call from Johnsen, who had been taken to the Modesto jail.  Johnsen asked Landrum to hide all the items he had taken from Rudy because he was worried that the police would soon get a search warrant and find Rudy's stolen property.  Landrum acceded to Johnsen's request and placed all the stolen goods into a truck.  Landrum then drove the items to a friend's house.  Landrum's friend refused to take possession of the items for safekeeping.

Landrum then phoned Johnsen's mother.  He informed her that Johnsen had left with a detective and that he had taken the items from Johnsen's home at his request.  Landrum and Johnsen's mother met up for dinner at a pool hall near Johnsen's home.  Afterward, they drove separately to Landrum's friend's house so they could transfer the items into Johnsen's mother's car.

Over the next few days, Johnsen's mother kept the items in the trunk of her car. She then asked her father, Johnsen's grandfather, to keep several of the items in his garage, including the microwave, portable bar, china plates, boom box, and possibly an answering machine. At some point, Johnsen's grandparents told her that they no longer had space, so Johnsen's mother moved the items to her aunt and uncle's home.

At trial, Johnsen's mother testified that she did not know that the items were stolen at the time. Despite her lack of awareness, she was suspicious about the origin of the items because Johnsen had told her, "As far as you know, I got it either at a garage sale or it was given to me."

*(d) February 28 – March 1, 1992*

On the morning of Friday, February 28, Rudy went to work. After work, she left Modesto for a weekend trip to Pebble Beach with friends without first returning home. Some time that weekend, Juanita Bragg and Leo Bragg, Sr., came to stay at their daughter Rudy's home (to avoid confusion, Leo, Sr., will be referred to in this opinion as Leo, and his son, discussed *post*, will be referred to as Leo, Jr). The Braggs lived in Las Vegas, but they came to Modesto every year to visit Rudy. So they could get into her home, Rudy left a spare key for them in a furnace just outside her home. The Braggs arrived at Rudy's home some time before 7:00 p.m. on Saturday, when they spoke with Rudy's daughter over the phone.

On Saturday, February 29, Landrum spent some of the evening at Johnsen's home, where he helped Johnsen and his mother prepare to move out of their home. Johnsen and Landrum also drank, smoked pot, and used methamphetamine together. Between 9:00 to 10:30 p.m., Landrum drove to his

mother's home in the same city, where he spent the remainder of the night. The next morning, around 8:30 a.m., Johnsen and his mother began moving out of their apartment. Johnsen was moving into a Modesto apartment with Landrum while Johnsen's mother was moving to San Jose. Landrum arrived at Johnsen's home around 10:00 a.m. to help them move.

Later that day, around 3:00 p.m., Rudy returned home. She spotted her parents' car parked in her carport. After parking her own car, Rudy unlocked the front door's deadbolt lock and entered her home. She immediately noticed that the house was quiet and the curtains were closed.

Rudy looked into the guest bedroom and saw her parents lying in bed. At first, Rudy assumed they were napping. When she entered the room, she heard Leo moaning. As Rudy approached him, he reacted fearfully, and she saw that the left side of his head appeared to be bashed in. Rudy then checked on Juanita. There was blood on Juanita's hair, and her body felt cold and damp. Rudy attempted to call 911, but the bedroom phone was missing and the line to the kitchen phone had been severed. Rudy was eventually able to call the police from a neighbor's home.

By the time the police and paramedics arrived, Juanita was dead. Dr. William Ernoehazy, a pathologist, arrived around 6:00 p.m. to analyze her body, which he found lying facedown on one side of the bed. He determined that Juanita had suffered over 15 blunt force injuries to her head, resulting in several skull fractures penetrating into her brain. He also identified six stab wounds on her neck and abdomen, and one that penetrated her airway. There were cuts on her wrist, hands, and fingers. Considering Juanita's injuries, Dr. Ernoehazy concluded she

died from blood loss from the injuries on the front, top, and back of her head caused by a ball peen hammer. Based on her body's lividity and the rigidity in her neck, upper extremities, and knees, Dr. Ernoehazy estimated that Juanita died between 10:00 a.m. and noon and estimated that she was attacked two to three hours earlier.

The police found Leo alive but badly injured. He was treated at a nearby hospital emergency room. A neurosurgeon treated the injuries to Leo's neck, head, and abdomen. Physicians removed skull fragments and a clot from Leo's brain, and sutured Leo's lacerated inferior mesenteric vein and two holes in Leo's large intestine and colon. According to his treating physicians, Leo would have died without this lifesaving surgery.

Detective Jon Buehler found no signs of forced entry into Rudy's home. All the windows and sliding glass doors remained closed, still secured with dowels. Detective Buehler concluded the only other entryway into Rudy's home was her front door, though there was no indication the door had been opened other than through ordinary use of a key. A locksmith confirmed that neither the door's deadbolt lock nor knob lock had been picked.

Inside Rudy's home, Detective Buehler discovered a pair of pantyhose consistent with the brand she wore, but irregularly located on her living room armchair. Forensic analysis found inside the pantyhose a four-inch clipped blond hair originating from a Caucasian individual. Through a polymerase chain reaction (PCR) test, it was also determined that the hair had a DQ-Alpha type of 2,4, common among 9 percent of the population. The lab testing destroyed the hair, so the hair itself was not introduced as an exhibit at trial. Detective Buehler also

found a bloody knife in a knife block in Rudy's kitchen. DNA analysis concluded that the blood on the knife had a DQ-Alpha type of 1.3,2, the same type as Juanita's and common among 3 percent of the population.

In the evening of March 1, Johnsen brought a paper bag with two phones and a calculator to the apartment of Linda Lee, his new neighbor. Lee was with a friend at the time. Johnsen was shaking and appeared scared and nervous. He asked Lee to "get rid of [the bag] where no one would ever see it again." After Johnsen left, Lee told her friend to go look for Johnsen, but her friend could not find him. Lee's friend then went to Landrum's mother, who lived two doors down to see if she would take the paper bag. His mother agreed to do so. A few weeks later, Johnsen sold a combination clock-radio-telephone to Lee.

*(e) Police Investigation*

On March 10, Rudy enlisted a moving company to pack her belongings at her home. During the move, a company employee informed Detective Taylor, who was at Rudy's home that day, that he found a bent five-inch kitchen knife covered in dried blood inside a dried flower vase in the guest bedroom. Lab testing found that the caked-on blood contained a mix of phosphoglucomutase (PGM) types matching Juanita's and Leo's blood. Because Landrum has the same 2+1+ PGM type as Juanita, he could not be categorically ruled out as a contributor to the blood on the knife.

Sometime between March 1 and March 25, Johnsen and Landrum gave or sold Jorge Romo a pair of yellow dishwashing gloves. Romo later gave the gloves to the police, and blood on the gloves was found to have a DQ-Alpha type of 1.3,2, the same as Juanita's.

7

About two weeks after March 1, Johnsen and Landrum drove to San Jose to visit Johnsen's mother and grandparents. On the drive, Johnsen attempted to hand Landrum the front door key to Rudy's home. When Landrum refused to take the key, Johnsen threw it out of the car window along with a ball peen hammer inside a blue sweatshirt. No home key or hammer was ever recovered by the police.

On March 25 or 26, Landrum accompanied Detective Jolene Gonzales to his mother's home, where Detective Gonzales took a calculator, jewelry, and three telephones into evidence. A few days earlier, Landrum's mother asked Landrum to take the suspicious goods away from her home, which she received from Lee and Lee's friend, who had in turn received them from Johnsen. Rudy identified two of the phones as hers and believed the third phone was the one her parents traveled with. Rudy also said the jewelry was hers and the calculator was owned by her father.

On March 26, Detective Taylor contacted Johnsen's mother about the goods Johnsen asked Landrum to hide. Johnsen's mother initially said she had no knowledge of the items, though she later conceded she kept them a secret because she "didn't want to hang her own son." The detectives picked up Johnsen's mother, and they went to her aunt and uncle's home, where they picked up a box of china plates, a boom box, a video recorder, a portable bar set, and a microwave. Rudy identified these as her property. An evidence technician discerned Rudy's daughter's fingerprints on the china plates.

*(f) Post-arrest Communications*

Johnsen was arrested on March 26. Johnsen called Lee from jail, and he learned that she had turned over to Detective

Grogan the combination clock-radio-telephone he (Johnsen) had sold her. Upon hearing this, Johnsen responded, "I'm done for now." Johnsen asked Lee if she would pretend to have memory loss during future conversations with the police since they "couldn't do anything" to her. Informing her that he had a key to Rudy's home because his mother used to rent that unit, Johnsen inquired whether Lee knew of anyone who would break into Rudy's home while he was in jail to draw suspicion away from him. Rudy later identified the combination clock-radio-telephone as hers.

From jail, Johnsen also called Chester Thorne, Lee's boyfriend and a recent acquaintance of Johnsen's. Johnsen inquired if Thorne knew of anyone who would be willing to "whack" Landrum and an unspecified woman, which Thorne understood to mean "kill." Johnsen wanted Landrum and the unspecified woman killed with a hammer and stabbed, and for the crime scene to be as bloody as possible. Johnsen also wanted the person to place a telephone and other items into a dumpster. According to Johnsen, these steps would cause the police to think that the person who assaulted the Braggs remained at-large, "still out there killing people."

Although Thorne did not intend to help Johnsen, he wanted to find out "for sure" whether Johnsen "really did kill them two old people," so he promised to look into it. When Johnsen asked Thorne if he would commit the requested murders in return for a "favor," Thorne refused, saying he would find someone else. Thorne did not tell the police about this call because there was a warrant out for his arrest for an unrelated matter, but he also took no steps to carry out Johnsen's request.

At some point, Thorne was jailed for receiving stolen property, unrelated to the offenses at issue here. While Thorne was incarcerated in the Stanislaus County jail, Johnsen passed him notes. Thorne copied one of Johnsen's notes in his own handwriting before handing the note back to Johnsen. That copied note instructed Thorne to inculpate "Mouse" (i.e., Landrum) for the crimes at Rudy's home, provided a set of "facts" for Thorne to rely on, and advised Thorne to tell the police Landrum "said he would kill you & Linda if you ever tell."

Thorne also testified about another of Johnsen's notes, in which Johnsen instructed Thorne and Lee as follows:

> "When Linda [Lee] is asked (on the stand) what it was that I said to her when I handed her the bag of property, she must not remember what I said to her. . . . [E]ven when [the police officer] remind[s] her, she still must have no memory of the words I said! No matter what! I will protect you and Linda till the day I die. I expect the same from both of you. . . . Remember, if you or Linda is asked a question, and you know the truth will hurt me, lose your memory!"

Thorne eventually pleaded guilty to various unrelated crimes, and in exchange for his truthful testimony against Johnsen, he received a reduced jail sentence of 16 months.

### (g) Confession to Eric Holland

From June to August 1992, Johnsen was housed in a Stanislaus County jail cell next to Eric Holland. Holland had previously been convicted of counterfeiting and forgery in federal court, and he also faced several pending felony charges for forgery and auto theft in several counties.

According to Holland, Johnsen repeatedly tried to convince nearby inmates to kill Landrum and Landrum's

girlfriend. Holland "wanted to get [Johnsen] to shut up," so Holland fabricated "a colonel in San Diego that could take care of it" for "a lot of money." After hearing this, Holland thought Johnsen would "blow his smoke" and "that would be the end of it," but Johnsen offered to pay the made-up contract killer with his Harley-Davidson motorcycle, some commissary credit, and any unconditional favors Holland might need in the future. Holland told Johnsen "the colonel owed him a favor worth $50,000" and therefore Holland's use of that favor on Johnsen's behalf would mean that Johnsen owed Holland $50,000.

Initially, Johnsen offered Holland a written confession for his role in the death of Johnsen's pregnant girlfriend, Terry Holloway, in San Diego, discussed in greater detail further below. Holland rejected this offer as inadequate collateral because he was concerned the confession could not be verified. He insisted that Johnsen's confession be related to his pending charges. Johnsen agreed to confess to the crimes at Rudy's home. He instructed Holland to tell the colonel to kill Landrum, Landrum's girlfriend, Landrum's mother, Landrum's uncle and girlfriend, Detective Grogan, Officer Fred Vaughn, Thorne, and Lee.

Johnsen told Holland three different versions of Juanita's murder. First, Johnsen claimed Landrum murdered the Braggs and that Landrum was framing him. Second, Johnsen said that both he and Landrum killed the Braggs. Third, Johnsen admitted that he alone was involved in Juanita's murder and the crimes at Rudy's home.

Johnsen told Holland specific details leading up to Juanita's murder. He had previously burglarized Rudy's home twice — once in September 1991 and once in February 1992 —

11

while he was living at his mother's home nearby. During the first burglary, he broke into Rudy's home to steal cash on a countertop. At the time of the second burglary, Johnsen asked Landrum to help him steal a television from Rudy's home, but Landrum could not make it. During one of these burglaries, Johnsen stole the front door key to Rudy's home.

Johnsen told Holland he had planned to move into an apartment on March 1 with Landrum. The evening of February 29, he and Landrum got "stoned" and played games. After Landrum returned to his mother's home for the night, Johnsen stayed awake watching television before eventually going to bed.

Around 5:30 a.m. on March 1, Johnsen woke up and "got dressed to kill." Because he was about to move away, Johnsen knew that this was his last opportunity to rape and kill Rudy, and he wanted to see if he could "do it." Johnsen went into his mother's kitchen to grab a pair of yellow dishwashing gloves, a knife, and a ball peen hammer. Using Rudy's spare front door key, Johnsen entered Rudy's home through the front entrance.

Johnsen entered Rudy's bedroom, which he found to be empty, before heading to the guest bedroom. Spotting an elderly couple asleep, he stood beside their bed for three minutes contemplating if he had the nerve to murder them. Johnsen then began stabbing Juanita and Leo with the knife and bludgeoning them with the hammer. As Johnsen stabbed them through the blanket, the knife he brought bent, so he went to the kitchen to get more knives. When Johnsen hit Leo in the head with the hammer, he assumed Leo had died when he saw Leo's skull depress an inch. To ensure he killed Juanita, Johnsen stabbed her body and slit her wrist and throat.

After he grabbed money from Leo's wallet and Juanita's purse, Johnsen walked around Rudy's home and found other items to steal, including Leo's calculator, several telephones, and a camera. He returned to the guest bedroom and noticed Juanita was still alive. To avoid being identified, Johnsen took a pair of pantyhose from Rudy's dresser and placed it over his head before reentering the guest bedroom to stab Juanita again. As the sun began to rise, Johnsen rushed to leave Rudy's home with a bag of stolen goods. He placed the bag by a dumpster before going inside his home. Johnsen told his mother he was jogging early in the morning and then went to McDonald's for breakfast with the rest of the household. As they were moving out, Johnsen saw an ambulance in front of Rudy's home around 3:00 p.m.

After learning some of these details, Holland informed his attorney about Johnsen's crimes, but Holland also asked his attorney "not to say anything" about Holland because he did not want to risk being labeled a snitch while in jail. Still, Holland wanted the district attorney to know about the confession because he believed Johnsen was "sick," and without the confession, Holland was worried Johnsen might "get off" and kill others. Holland's attorney informed District Attorney Investigator Fred Antone.

Believing Johnsen's signed confession would be sufficient, Holland was under the impression he would not need to testify at Johnsen's trial for the notes to be admissible. But on June 26, 1992, Antone arranged a meeting with Holland and his attorney, during which Antone informed Holland that he would need to testify or Johnsen's written confession would be inadmissible at trial. At the meeting, Holland told Antone that if he had to testify, he wanted his state sentence to run

13

concurrently with his federal term, so he would not be villainized as an informant while serving time in a California prison. Antone made no promises, telling Holland: "[I] want you to understand that I'm not asking you to be a police agent and do these things for me."

Informing Antone that he could probably get Johnsen to disclose details about Holloway's murder in writing, Holland asked, "Should I continue, should I stop?" Antone responded, "Well, that's, that's up to you, Eric." Holland's attorney then advised him, "The only agreement that they're making with you at the moment is not to use any of this against you." At the close of the meeting, Holland signed a written form acknowledging that he was receiving nothing in return for his continued engagement with Johnsen.

On July 3, 1992, Holland and Antone met again. At that meeting, Holland said that he could get a written confession from Johnsen soon, but that he would not hand over the confession unless the prosecutor cut him a deal. Antone refused, saying, "If you have any idea that you even think you're working for us, stop," and he stressed, "I don't want you to do anything to try and make my case [against Johnsen] better."

Over several weeks, between June and a few days after Holland's July 3 conversation with Antone, Johnsen gave Holland several written notes, prompted by questions from Holland. In the first, Johnsen claimed Landrum committed the crimes. In the second, Johnsen wrote that he and Landrum committed the crimes together. For the third, Johnsen wrote out two or three pages detailing his sole responsibility for the crimes. Holland rejected this confession as inadequate collateral because it offered only cursory details. Consequently,

Johnsen prepared a 14-page account with two one-page supplements, where Johnsen again took sole responsibility. Johnsen also prepared additional notes detailing various aspects of the crime. Johnsen flushed the first note and third note down his toilet.

By September 1992, Holland refused to testify at trial because the district attorney had still not entered into any agreement with him. Soon after, Holland was served a search warrant of his cell, and several notes were confiscated, including Johnsen's 14-page confession. A handwriting expert confirmed that the writing on the confession and notes matched Johnsen's handwriting. Johnsen's fingerprints were also found on all but one of the pages of his written confession and on all of the notes passed between Johnsen and Holland. Only after Holland was told that he would be subpoenaed did he agree to testify. Holland committed to tell the truth at Johnsen's trial; in exchange, his state sentence would run concurrently with his federal sentence.

### 2. Defense Case

#### (a) February 29 – March 1, 1992

On March 1, David Johnson, a coworker of Johnsen's mother and unrelated to the Johnsens, moved into the home as Johnsen and his mother were moving out. Johnson noticed a gauze bandage around Landrum's left hand, and he remembered Landrum playing with the bandage.

Johnsen's mother learned from Johnsen that an unknown person's blood was found on the knife, in violation of the court's order not to discuss her testimony with Johnsen. Following that conversation, she recalled seeing Landrum with a bandage on his hand. Johnsen's mother also testified that she gave

Landrum a spare key to her home so he could help care for her cats. Landrum handed the key back to her four days later, well before March 1. Antone testified that he recalled seeing a quarter-inch scar between Landrum's thumb and forefinger, "near the webbing." Landrum told Antone that he got the scar eight years ago while playing a knife game.

Johnsen's mother also testified that when she went to bed on February 29 around 10:30 p.m., Johnsen was still lying on the sofa watching television. Around 3:00 a.m., she woke up to stop a running toilet, and because she saw Johnsen asleep on the sofa with the television still on, she turned the television off. Around 6:40 or 6:45 a.m., Johnsen's mother woke up to see Johnsen awake on the couch. The two of them went to McDonald's for breakfast with their housemates, the Greshams, around 7:00 a.m. and returned to the home between 7:30 to 7:45 a.m. Around noon, Johnsen and Landrum went for a 10-minute walk to buy soda and beer. They spent the rest of the afternoon moving out of the home, leaving for good around 5:00 p.m.

Ray Gresham, a cotenant of the Johnsens, testified that he and his six-year-old stepdaughter woke up around 6:30 to 7:00 a.m. to find Johnsen and his mother already awake. All of them went to McDonald's, and they spent the rest of the day moving out. Gresham recalled Johnsen leaving the home around 10:00 a.m. for about 30 minutes to buy soda.

After testifying for the prosecution, Landrum was recalled as a defense witness. Landrum testified he was 99 percent sure that on the night of February 29, he left Johnsen's home between 10:00 to 10:30 p.m. and slept at his mother's house. The only other person there with him that night was his mother, who left for work around 6:00 a.m. On the morning of March 1, he

woke up at his mother's home at around 8:00 a.m., had breakfast, and watched television. Around 10:00 a.m., he drove to Johnsen's home to help the Johnsens move out. Landrum denied having a cut on his hand that morning or wearing a bandage on his hand. He denied ever possessing a key to Johnsen's home, aside from the day when Johnsen "went away with the police" and Johnsen left Landrum his house key. He returned that key to Johnsen's mother later that day. Landrum also denied participating in any crimes at Rudy's home.

### (b) *Juanita's Time of Death*

Dr. Ernoehazy, a time of death expert, testified that he had performed over 10,000 autopsies and testified on time of death hundreds of times. As noted, Dr. Ernoehazy examined Juanita's body inside Rudy's home around 6:00 p.m. on March 1. He observed that her body had not yet begun to decompose, which led him to conclude she had not been deceased for "a very long period of time." Based on her body's lividity and rigidity, he estimated that Juanita likely died between six to eight hours before 6:00 p.m. — in other words, between 10:00 a.m. and 12:00 p.m.

During the preliminary hearing, Dr. Ernoehazy said that Juanita's injuries were probably inflicted no more than one or two hours before her death, which would place the attack between 8:00 a.m. to 11:00 a.m. At trial, Dr. Ernoehazy could not recall exactly the basis for that prior estimate, and he opined that the amount of bodily hemorrhaging and vital reaction suggested that Juanita likely died several hours after her injuries. On cross-examination, Dr. Ernoehazy conservatively estimated that Juanita died more than five minutes but less than 24 hours after sustaining her injuries, which was

consistent with the prosecution's theory that Juanita was mortally wounded by Johnsen at around 5:00 or 6:00 a.m. on March 1.

### (c) Eric Holland

A witness testified that he sold a 1987 Porsche to Eric Holland for a $20,600 cashier's check in 1990. The cashier's check turned out to be fraudulent.

### 3. Prosecution Rebuttal

Detective Grogan testified that he did not see a bandage on Landrum's hand when he saw Landrum on March 1 at 7:00 p.m. Detective Taylor testified that Johnsen's mother told him that she woke up at 7:00 a.m. on March 1 and that Gresham said he woke up around 7:30 a.m. that day.

## B. Penalty Phase

### 1. Prosecution Case

### (a) Prior Criminal Acts

Holloway's former coworker Edward Nieto saw Johnsen slap Holloway's face multiple times with his open hand. In June 1990, Johnsen threatened to hit Nieto's new car with a bat because he had offered to give Holloway a ride to work. When Nieto called to check on Holloway, Johnsen answered the phone, and Holloway had been tied up. When Johnsen placed the phone over Holloway's ear, she sounded fearful. However, she asked Nieto not to call the police. The next time Nieto saw Holloway at work, she had cut wrists and marks around her ankles. Three days later, Johnsen came to their work and pointed a gun at Nieto. Johnsen threatened to kill Nieto if Holloway refused to talk to him.

On May 17, 1991, Holloway's body was found in a drainage ditch off a highway in San Diego. Forensic pathologist and deputy medical examiner Dr. Mark Super autopsied Holloway's body. At the time of her death, Holloway was 16 to 17 weeks pregnant with Johnsen's child. Dr. Super observed that Holloway had suffered several face and scalp lacerations, facial bone fractures, defensive wounds on her hands, and strangulation abrasions on her neck. Her injuries were consistent with assault with a scissor jack and strangulation, as evidenced by hemorrhaging in her eyes, deep neck bruises, and fractures in her larynx and hyoid bone. He opined that Holloway died by strangulation and blunt force injury to her head.

At the time of Holloway's death, Johnsen was confined at the San Diego County jail. Two days before the discovery of Holloway's body, Johnsen called his friend Mark Schmidt and asked to speak with Robert Jurado. Schmidt, Jurado, Denise Shigemura, and Holloway all went to Schmidt's apartment to await Johnsen's call. When Johnsen called, Jurado and Shigemura took the call in another room. Johnsen also spoke privately to Holloway. Around then, Jurado's girlfriend, Anna Humiston, arrived at the apartment.

After Johnsen ended the call, Schmidt gave Jurado a Weed Eater wire, which Schmidt characterized as a clear thin plastic line used for lawn trimmers. Jurado looped the wire around his neck, tightened it, and commented, "[t]hat will do." At Jurado's insistence, Schmidt told Holloway to leave with everyone else. At around 8:45 p.m., everyone except Schmidt left the apartment.

On May 16, Humiston called her friend Melissa Andre and told her that she was involved in something very bad with Jurado and Shigemura. Humiston told Andre that the three of them had murdered Holloway on May 15. While Holloway was sitting in the front passenger seat of Shigemura's car, Jurado and Humiston sat in the back seat. Jurado began strangling Holloway with the wire as Humiston punched Holloway. "Why are you killing me and my baby?" Holloway screamed, as she begged them to "[p]lease stop." They pulled to the side of the highway, which allowed Jurado to throw Holloway's body into a ditch and beat her with a tire jack to confirm she was dead.

Another friend of Humiston's, Mia Rodigues, testified that Humiston told her on May 16 that she helped kill "Terry." She told Rodigues how it happened: while in the car, Humiston pinned Holloway's arms down as Jurado strangled her with a rope and killed her with a car jack. With Humiston's help, Jurado then threw Holloway's body into a ditch. On May 17, Humiston and Rodigues spoke and discussed Holloway's murder again. According to Humiston, during the attack, Holloway pleaded, "[w]hy me?" and "[t]ell me why."

Holland testified regarding Johnsen's notes confessing to his involvement in Holloway's murder, which occurred about a year before the crimes at Rudy's home. That handwritten note was admitted into evidence. A handwriting expert confirmed the note's writing as consistent with Johnsen's, and a fingerprinting expert found latent prints from Johnsen and Holland on the note.

Johnsen's written confession offered an account consistent with the testimony of the other witnesses. Johnsen called Schmidt so he could speak with Jurado and Shigemura. All of

them went to Schmidt's house with Holloway, as did Humiston. Jurado and Shigemura learned from Johnsen that Holloway threatened to tell drug dealer Doug Mynatt that Johnsen, Jurado, and Shigemura were planning to kill him. Johnsen was also angered because Holloway was using methamphetamine while pregnant with their child. Johnsen then spoke privately with Holloway and conveyed his anger about her threats to "snitch" on them for planning to kill Mynatt. He noted her actions would "get a lot of people killed, including me." Johnsen spoke again privately with Jurado, who said they would need to kill Holloway. If Johnsen could persuade Holloway to leave Schmidt's apartment with the others, Jurado agreed to "do the rest."

Johnsen then told Holloway that he would tell her everything she wanted to know later, and he encouraged her to leave with Jurado, Humiston, and Shigemura. Johnsen promised to call her later that evening. Two days later, on May 17, the police informed Johnsen that Holloway had been murdered. Johnsen told them he believed Brian Dick, a drug dealer, was the perpetrator because Holloway owed him money.

On September 1, 1991, San Diego District Attorney Investigator Anthony Bento interviewed Johnsen as a witness in Holloway's murder. Johnsen admitted his involvement in the conspiracy to murder Mynatt. He also expressed sadness about the death of Holloway and their unborn child. Jurado, Shigemura, and Humiston pleaded guilty or were convicted of Holloway's first degree murder. (See *People v. Jurado* (2006) 38 Cal.4th 72, 82.) The record does not reflect whether Johnsen was charged with any crimes related to Holloway's murder.

21

### (b) Victim Impact Evidence

Dr. Lloyd Brown, the medical director of Leo Bragg's outpatient rehabilitation facility, testified about Leo's recovery. Leo spent half a year at the facility from June 1992 to December 1992. Before his arrival, Leo had already received physical rehabilitation for his injuries, so Dr. Brown's efforts centered on restoring Leo's cognitive and communication capabilities. Upon Leo's arrival, his ability to process information was severely debilitated, and he could not use proper facial expressions or speak except for an occasional word. Leo began to regain control of his bladder, but it was not safe to leave him alone at any time due to impulsivity that arose due to his brain injuries. After half a year of cognitive rehabilitation, Leo left the facility still very impaired; he still could not carry on a conversation orally or in writing. In Dr. Brown's view, Leo would never be able to live alone or make his own decisions; he would need constant supervision for the rest of his life.

The Braggs' adult children testified about their mother's death and the caretaking duties they took on for their father. Rudy constantly visualized her mother's dead body, and her mother's death affected her daily. Rudy's personality changed after the murder, causing her to become fearful and avoid people. Rudy also felt personal guilt for her mother's death and father's near-death injuries, believing that she should have realized her key was missing sooner and that she should not have left town for the weekend. Leo Bragg, Jr., testified about his difficulty coping with the loss of his mother.

After the attack, Leo spent three months in the hospital, a few days with Rudy, and the next six months at a cognitive rehabilitation facility in Tennessee. During Leo's brief stay with

Rudy, he could not communicate with her, his actions were unpredictable, and he had no control over his body. Because his injuries prevented him from communicating properly, Rudy felt as though she had lost him too.

Leo, Jr., and his wife took on full-time caretaking duties for his father. Constantly agitated, frightened, emotional, and impulsive, Leo had to be constantly supervised; as a result, Leo, Jr.'s wife quit her part-time college teaching job to care for him and usher him between his medical and rehabilitation appointments. Leo had to be retaught basic tasks as though he were a child, which was made more difficult by the fact that they could no longer communicate with him. He regularly broke down emotionally every time he saw a picture of Juanita. After 15 months of familial caregiving, he was moved to an assisted living facility. By that time, Leo could only muster smiles, handshakes, and an occasional farewell.

### 2. *Defense Case*

Clinical psychologist Dr. Gretchen White prepared a psychosocial history of Johnsen. She reviewed case materials, educational records, and mental health records. She also interviewed Johnsen's family and his mental health clinicians.

Her report revealed that Johnsen had warning signs for future psychological problems as early as infancy. Johnsen was a "difficult" baby, cried often, had frequent infections, and had difficulty sleeping. His father was routinely absent from Johnsen's childhood because of his naval service, so he barely parented his sons. Johnsen was the eldest sibling, and he was talented at the piano, which improved his self-esteem until he quit playing at age eight or nine. Johnsen's grandparents were

involved in Johnsen's life, including whenever his parents were absent.

During his early childhood, Johnsen was prescribed Ritalin for his defiant, erratic, and fidgety behavior in school. Dr. White suspected that Johnsen had attention deficit hyperactivity disorder (ADHD) and that his mother's lack of structure exacerbated its effects. His parents took him off Ritalin at age eight or nine without medical consultation. Johnsen's father was concerned the drug was stunting his growth, and his mother believed he no longer needed it because he was doing well in school. Johnsen's behavioral problems returned after his prescription was discontinued.

During Johnsen's early teenage years, his parents separated and divorced. Following the separation, Johnsen's father became more involved in his life, but his involvement declined when he remarried. Johnsen disliked his stepmother; she in turn was critical of him. At one point, Johnsen gave his father an ultimatum, demanding that his father choose between him or his stepmother. When Johnsen was 16 years old, Johnsen's father discontinued his relationship with his sons, and Johnsen's tearful pleas for him to visit were rebuffed. After that, Johnsen's father only contacted his sons by sending cards to them for their birthdays and for Christmas, with a few dollars inside.

Robert Remmer, a friend of Johnsen's mother who lived with the Johnsens for about 10 years, babysat Johnsen when his mother traveled for work. Remmer exerted minimal discipline in Johnsen's life, and he often smoked pot and ingested methamphetamine with Johnsen and Johnsen's brother, Kevin. Dr. White identified Johnsen's mother's boyfriend, Jack

Minteer, as a positive influence on his life when he was 17. When Johnsen's mother and Minteer broke up, his departure disappointed Johnsen.

In middle school, Johnsen began using pot. He started using methamphetamine about a year later, at age 14 or 15. Johnsen may also have used LSD and cocaine. A neighbor of the Johnsens told Dr. White about an incident in Johnsen's teenage years when the neighbor's bathroom window screen was slashed and a hand was stuck through it while his daughter was showering. The neighbor went to Johnsen's home, where he saw a carpet knife on the table, and Kevin told him that Johnsen had been cutting window screens around the neighborhood.

After Johnsen overdosed and was hospitalized at age 17, he was enrolled in a drug treatment program with his brother. While undergoing treatment, Johnsen lamented the absence of his father in his life. A psychologist found that Johnsen's loss of his father from his life had a strongly negative impact on him. The psychologist also noticed Johnsen had a fear of failing due to anticipation of criticism and that his fear of failure infected his daily life. He diagnosed Johnsen with an "under socialized, nonaggressive" conduct disorder as well as cannabis and amphetamine dependency. The psychologist spotted symptoms consistent with ADHD, dysthymic disorder, and borderline personality disorder, but he never formally diagnosed Johnsen with any of those conditions because he was hesitant to label teenagers whose brains and personalities were still in flux.

Upon Johnsen's discharge, the treatment center recommended that Johnsen be moved into a residential treatment program, but he ended up moving back in with his

mother. Following treatment, Johnsen maintained sobriety for about six months.

Johnsen, his brother, and his mother were referred to outpatient counseling with a family therapist. They received counseling for 20 to 25 weeks. During these sessions, Johnsen's mother regularly complained about Johnsen and his brother, and said she had no time to raise them because of her work. Johnsen disliked these counseling sessions and often expressed his anger and depression during them. But the therapist avoided prescribing Johnsen antidepressant medication in light of Johnsen's history of drug abuse. These sessions caused the therapist to believe that Johnsen suffered from dysthymic disorder, borderline personality disorder, and major depressive episodes. The therapist did not suspect that Johnsen suffered from any antisocial personality disorders. At age 19, Johnsen was once again entered into a drug treatment program.

A former director of the California Department of Corrections testified about Johnsen's three disciplinary reports during his two-year pretrial detention, which included not being dressed in time for court, not being out of jail clothes in a timely manner, and unauthorized possession of the painkiller Motrin. Based on Johnsen's behavior while incarcerated, he concluded that Johnsen would not be a danger to others if he were sentenced to life without the possibility of parole. But he had no answer to whether he was confident Johnsen would stop soliciting the murder of witnesses and others from inside prison.

## II. PRETRIAL ISSUES

### A. Denial of Motion To Change Venue

Johnsen contends that the trial court erred in denying his motion to change venue from Stanislaus County. According to

26

Johnsen, the county's media outlets engaged in "inflammatory coverage" that publicized inadmissible evidence and erroneously reported that Johnsen had "attempt[ed] to manipulate the system and delay the trial, thereby costing the county thousands of dollars." He alleges that the court's denial here deprived him of a fair jury trial in violation of the Sixth Amendment to the federal Constitution.

### 1. Background

Before trial, in November 1993, Johnsen moved for a change of venue pursuant to section 1033. In support of his motion, Johnsen compiled about 20 news articles pertaining to his case and attached a survey report by Dr. Stephen J. Schoenthaler, a criminal justice professor at California State University, Stanislaus, which concluded that Johnsen could not have a fair trial in Stanislaus County.

The district attorney opposed Johnsen's motion, arguing that Professor Schoenthaler's survey did not even ask interviewees the crucial question: whether they would be willing to set aside their preexisting views and decide the case based on evidence introduced at trial. The prosecutor's opposition also noted that all 35 relevant newscasts aired in March 1992 in the weeks after Juanita's murder and at the time of Johnsen's arrest — nearly two years before Johnsen's trial began in February 1994.

The trial court held a four-day hearing on Johnsen's motion. Reviewing the newscasts, the court noted that in the aftermath of Juanita's killing, journalists used fairly strong language to describe the scene, characterizing it as "an awful story," a "tale too horrible to believe," a "vicious and baffling crime," and a "brutal crime against innocent people" with "no

motive." On March 3, some newscasts noted a $10,000 reward for information leading to the perpetrator's arrest. Upon Johnsen's arrest, a few newscasts used photos of Johnsen as the suspect, noting that Johnsen had been acting suspiciously. Finally, on March 30, 1992, one newscast suggested that the investigation into Johnsen had unearthed some evidence linking him to the crime scene.

At the hearing, the court also considered testimony from several experts. Professor Schoenthaler detailed his survey findings, whose bottom-line findings purported to establish that Johnsen could not receive a fair trial in Stanislaus County. To conduct the survey, defense investigators randomly called Stanislaus County phone numbers and asked 239 adult respondents whether they had been exposed to pretrial publicity pertaining to Johnsen's case. The survey found that 70 percent of respondents had already heard of Johnsen's case, that 41 percent believed Johnsen killed Juanita, and that 60 percent believed that Johnsen, if convicted, deserved the death penalty.

Prosecution expert Dr. Ebbe Ebbesen, a psychology professor at University of California, San Diego, contested the survey findings. Before Johnsen's trial, Dr. Ebbesen had testified in opposition to venue change motions 25 times. First, he criticized change-of-venue surveys generally, arguing that such studies are poor predictors of how jurors may behave at trial. Second, Dr. Ebbesen contested the survey's selection methodology on the ground that the survey participants were unrepresentative of the people who might be called for jury duty and unrepresentative of those who might actually be selected for the jury following voir dire. Third, Dr. Ebbesen rejected the survey's bottom-line conclusion in light of the questions asked, opining that the questions did not accurately pinpoint

respondents who had prejudged the case based on media exposure. Finally, even taking the survey results at face value, Dr. Ebbesen opined that 44.1 percent of residents had no exposure to media publicity whatsoever and had no fixed view about the case, and that less than one in four residents could present impartiality problems in light of the case's publicity.

After hearing from both sides, the court had "serious doubts about the validity of the defendant's survey." Professor Schoenthaler's survey, according to the court, "was not conducted in a manner to ensure that the respondents were representative of the individuals who might serve on the jury for this case," and it failed to "ask a sufficient range and variety of questions to provide good evidence about the meaning of the responses."

The court also found that based on Dr. Ebbesen's testimony, the survey "did not show the high numbers of persons that were so affected that they could not be fair and impartial." "No more than 20 percent of the venire have knowledge and attitudes that might prevent them from serving in a fair manner." The court also observed that "editorializing in both [the defense expert's] report and in his testimony" suggested "some bias toward the defense." In the end, the court credited Professor Ebbesen's report over Professor Schoenthaler's survey.

The court observed that the nature and gravity of Johnsen's offense supported a venue change, but that all of the other legally relevant factors weighed in the other direction. The court ultimately denied Johnsen's motion, finding there was not a reasonable likelihood that Johnsen could not receive a fair and impartial trial in Stanislaus County. Still, the court left

open the option for Johnsen to renew his venue change motion if issues arose during the jury selection process. In response, Johnsen sought a writ of mandate in the Court of Appeal, which the court denied. (*Johnsen v. Superior Court*, writ petition summarily denied Jan. 28, 1994, F020985.)

### 2. *Discussion*

The Sixth Amendment guarantees the right to "an impartial jury." (U.S. Const., 6th Amend.) In furtherance of this right, California law provides that "the court shall order a change of venue . . . [¶] . . . [o]n motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033; see *People v. Smith* (2015) 61 Cal.4th 18, 39 [a " ' "reasonable likelihood" . . . "means something less than 'more probable than not' " and "something more than merely 'possible' " ' "].) To make this determination, the court must consider "the nature and gravity of the offense, the nature and extent of the media coverage, the size of the community, and the community status of the defendant and the victim." (*Smith*, at p. 39.)

"The trial court's essentially factual determinations such as the gravity of the crimes, the size of the community, the status of the defendant and victims, and the nature and extent of the pretrial publicity, will be sustained if supported by substantial evidence. We independently review the trial court's ultimate determination of the reasonable likelihood of an unfair trial." (*People v. Cooper* (1991) 53 Cal.3d 771, 806.) On appeal, Johnsen must show both error and prejudice — i.e., it was (1) " 'reasonably likely that a fair trial could not be had in' " Stanislaus County at the time of his motion, and (2)

" 'reasonably likely that a fair trial was not had' " based on voir dire of prospective and actual jurors. (*People v. Famalaro* (2011) 52 Cal.4th 1, 21 (*Famalaro*).) Because we find no error in the court's denial of Johnsen's motion to change venue, we do not proceed to consider prejudice.

Beginning with the first factor, there is no doubt that the nature and gravity of Johnsen's alleged offenses — the capital murder and attempted murder of an elderly couple while they were asleep — are grave allegations that weigh in favor of a venue change, as the trial court noted. (*People v. Jennings* (1991) 53 Cal.3d 334, 360; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1159.) As the press coverage highlights, people in the community "lived in fear" after this violent home invasion and viewed the "brutal crime against innocent people" as particularly sensational. But because the nature and gravity of the offenses in this case are not dispositive by themselves in favor of a venue change (cf. *Hamilton*, at p. 1159 [there is no "presumption in favor of a venue change in all capital cases"]), we proceed to consider the other factors.

With respect to the second factor, substantial evidence supports the trial court's assessment that the nature and the extent of media coverage in Johnsen's case does not weigh in favor of a venue change. According to Johnsen, some media reports pertained to inadmissible evidence, hinted at Johnsen's confession, inaccurately reported that "detectives found a bloody hammer, bloody tennis shoes and several of Sylvia Rudy's possessions in [Johnsen's] apartment," and were potentially inflammatory by noting Johnsen's possible involvement in a different homicide and his invocation of his Fifth Amendment right to silence. Johnsen also complains that a few articles noted that his case had gone through several lawyers who had

declared conflicts of interest through no fault of Johnsen's and that Johnsen had filed a $1 million lawsuit against one of his former lawyers.

After reviewing all the media articles and newscasts relating to Johnsen's case, the court observed that there were not so many articles pertaining to the case, approximately 30. Even Professor Schoenthaler acknowledged that the media publicity surrounding Johnsen's case was "fairly moderate." While a few articles used strong language and speculated beyond the facts of Johnsen's case, the court noted that those articles were few and far between, and the court chalked up those discrepancies to "sensationalism . . . typical of the TV."

Finally, given that most of the coverage occurred nearly two years before Johnsen's trial, the court noted that the coverage was temporally limited and had largely subsided "over the passage of time." This conclusion was further bolstered by the trial court's observation, in response to Johnsen's request for additional peremptory challenges during voir dire, that few jurors had even heard of the case. The court noted "any publicity that [the jurors] had received was so attenuated and so long ago that it didn't have any effect at all."

Substantial evidence supports the trial court's factual findings. Over a two-year period, there were a few dozen news articles published about Johnsen's case, and most were written nearly two years prior to Johnsen's trial. As we have recognized, "[t]he passage of time ordinarily blunts the prejudicial impact of pretrial publicity." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1077; see *People v. Bolin* (1998) 18 Cal.4th 297, 314 ["the effect of the publicity" was less "substantial . . . after an 11-month interim" between the coverage and the defendant's

trial]; *People v. Ramirez* (2006) 39 Cal.4th 398, 434 (*Ramirez*) ["passage of more than a year from the time of the extensive media coverage served to attenuate any possible prejudice"].) It is also true that strong language appeared in some articles. But their characterizations were not disproportionate to the facts and circumstances of the crimes. (*People v. Suff* (2014) 58 Cal.4th 1013, 1048 [" 'Media coverage is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case.' "].)

Moreover, the trial court took appropriate steps to avoid prejudicial pretrial media coverage. Media reports conveying dramatic facts that would not be admissible in court may inflame potential jurors and render a future trial in the county unfair. (See *Williams v. Superior Court* (1983) 34 Cal.3d 584, 592 [media coverage of defendant's charges of burglary and assault with a deadly weapon, which were later dismissed, "could nevertheless have inflamed potential jurors"].) Prejudice may also arise from media reports that suggest the defendant committed the offense. (See *Martinez v. Superior Court* (1981) 29 Cal.3d 574, 579–580) [finding potentially prejudicial an article discussing a witness's invocation of the 5th Amend. during a codefendant's trial and describing the witness's admission to being defendant's partner in charged crimes and disposing of weapons].) Such media coverage, especially when widespread or occurring close in time to jury selection, "can dangerously lead to prejudgment by the reader or listener of the news coverage" and so generally "weigh[s] heavily" in favor of changing venue. (*Williams*, at p. 591.) The trial court largely avoided such pretrial publicity by, for example, excluding the press from the suppression hearing on Holland's testimony and Johnsen's confession to Holland.

Next, we turn to the third factor, the size of the community. "The size of the community is important because in a small rural community, a major crime is likely to be embedded in the public consciousness more deeply and for a longer time than in a populous urban area." (*People v. Coleman* (1989) 48 Cal.3d 112, 134; see *Rideau v. Louisiana* (1963) 373 U.S. 723, 724, 726 [finding denial of venue change violated due process where a film of the defendant admitting to various offenses aired three times in a parish (similar to a county) with a population of 150,000 and was viewed by 24,000, 53,000, and 29,000 people]; *People v. Duong* (2020) 10 Cal.5th 36, 50 [" 'populous metropolitan character of the community [can] dissipate[] the impact of pretrial publicity' "].) The trial court found that the size of Stanislaus County did not weigh in favor of Johnsen's venue change motion. The parties stipulated that at the time of trial, the county was home to "405,000 people . . . . It's not the largest county in California and it's not the smallest." In *People v. Vieira* (2005) 35 Cal.4th 264, we held that the size of Stanislaus County alone did not weigh in favor of a venue change at the time of another defendant's trial in the 1990s. (*Id.* at pp. 280–283 [finding that the size of Stanislaus County, with a population of approximately 370,000 according to the 1990 census, did not compel a venue change].) When Johnsen's trial took place in 1994, the county's population had risen by 35,000. (*Ibid.*) In light of these data, substantial evidence supports the court's finding.

As for Johnsen's social status, the court observed that "[t]here's no evidence that [Johnsen] was well-known in his community or a public figure or that he grew up in Modesto and lots of people know him, whether he went to school here or high school or anything of that nature." The absence of any

reputation in Modesto renders Johnsen's social status a
" 'neutral factor[].' " (*Famalaro*, *supra*, 52 Cal.4th at p. 23.) Nor
does the social status of the victims favor venue change.
Johnsen presented no evidence showing the Braggs were known
in Stanislaus County. In fact, the record shows that they were
Las Vegas residents who visited Rudy in Modesto for only a
week annually. Since "[n]either defendant nor the victim[] w[as]
known to the public prior to the crimes and defendant's arrest,"
their relative obscurity properly weighed against venue change.
(*Ramirez*, *supra*, 39 Cal.4th at p. 434.)

In sum, although substantial evidence supports the trial
court's findings that the nature and gravity of Johnsen's crimes
favored Johnsen's motion to change venue, all the other factors
weighed against his motion. Reviewing the legal question de
novo based on the factors above, we conclude Johnsen has not
shown a reasonable likelihood that a fair trial could not be had
in Stanislaus County at the time of his motion. The trial court
did not err in rejecting his motion.

## B. Admission of Jail Informant Testimony

Johnsen alleges the incriminating statements elicited by
Holland outside the presence of Johnsen's counsel violated his
right to counsel under the Sixth Amendment and article I,
section 15 of the California Constitution.

### 1. *Background*

Johnsen was arrested on March 26, 1992. A few days
later, on March 30, the prosecutor filed a complaint against
Johnsen, charging him with murder with special circumstances,
attempted murder, robbery, and burglary. The charges in the
information pertained exclusively to the crimes at Rudy's home;

none of the allegations were associated with Holloway's death in San Diego.

From June to August 1992, Johnsen was awaiting trial in a jail cell adjacent to Holland's. Holland had been previously convicted of various forgery and counterfeiting offenses in federal court, and he had ongoing state criminal proceedings alleging forgery and auto theft. According to his testimony, Holland had no prior history of "giv[ing] any information to law enforcement officials of any type."

Holland testified that Johnsen, while incarcerated, solicited his fellow inmates to murder Landrum and Landrum's girlfriend, claiming that Landrum was framing him for Juanita's murder. Thinking it would "put an end" to Johnsen's solicitation and "get him to shut up," Holland pretended that he knew of a "colonel in San Diego" who would eliminate Johnsen's targets in return for a sizable fee. Johnsen named a list of people he wanted the "colonel" to kill, including Landrum's girlfriend, mother, and uncle as well as Landrum. Johnsen also demanded that Detective Grogan, Officer Vaugh, Thorne, and Lee be eliminated. Johnsen outlined how he wanted them all to be killed.

As collateral, Johnsen offered to prepare a written confession detailing his involvement in Holloway's murder in San Diego. Holland initially rejected this proposal. Johnsen then offered to reveal his involvement in the crimes at Rudy's home, which Holland accepted. From that point forward, Johnsen described his crimes against the Braggs in 35 detailed notes responding to Holland's extensive questioning. Johnsen eventually also told Holland about "how he ended up being

involved in killing his girlfriend and his unborn child" a year earlier.

Johnsen's admissions worried Holland. Holland was particularly perturbed by Johnsen's lack of motive for killing the Braggs. Johnsen told Holland he tried to kill them "because he wanted to see if he could get away with killing somebody." Because of his concerns that Johnsen might "get off" and kill others, Holland asked his attorney to convey all the information he had learned to the district attorney. At that time, Holland insisted he did not want "anything" in return, but he also did not want to testify at trial because that would put him at risk while incarcerated.

On June 26, Holland's attorney arranged a tape-recorded meeting with District Attorney Investigator Antone. Antone told Holland that he understood Holland "may want to work a deal or something along those lines." Antone said he "was definitely interested" in any information that Holland had to offer and that he could guarantee Holland would not be prosecuted for anything he disclosed. However, Antone also clarified that the district attorney would make no promises for Holland's cooperation. Holland disclosed details to Antone about the crimes at Rudy's home, including Johnsen's motive for killing Juanita and Johnsen's solicitation of fellow inmates. Antone reminded Holland, "I'm not asking you to be a police agent and do these things for me," to which Holland responded: "Oh, I do this on my own."

Holland then told Antone that Johnsen had mentioned being involved in a San Diego murder last year and that he expected Johnsen to reveal his role in that crime later that evening. Antone emphasized it was up to Holland whether he

decided to inquire into the San Diego murder, saying, "I don't want get [sic] anything construed . . . where at some point in time you come back and says, well I only did it for, cause Antone, you know . . . said it would be okay." Holland acknowledged that he was not planning to ask Johnsen on behalf of the district attorney and that he just wanted to know he would not be prosecuted for lying to Johnsen. Antone confirmed that the district attorney would not prosecute him for lying to Johnsen.

On July 3, Holland met with Antone without counsel. At this tape-recorded meeting, Holland wanted assurances that a leniency deal would be forthcoming. Antone explained that the process of even arranging such a deal would require coordination between multiple counties given the charges pending against Holland, and Antone refused to say if any deal was in the works. Holland told Antone he had convinced Johnsen to write several incriminating notes, and Holland was confident he could persuade Johnsen to prepare a signed confession detailing "exactly what happened" at Rudy's home. Holland insisted that if he were to hand over that information to convict Johnsen, it would only be used if he got a deal. Antone left the room to confer with the deputy district attorney. Upon his return, Antone refused to enter into any agreement, even with a signed written confession.

In August, Holland called Antone to tell him that Johnsen had accused Holland of being a snitch. To protect Holland from potential retribution, the district attorney arranged for Holland to be moved from the Stanislaus County jail to the San Joaquin County jail.

By September, Holland refused to testify because the district attorney had still not committed to any leniency

agreement. After learning that they had secured a warrant to search his jail cell, Holland promised to testify at trial about his jailhouse conversations with Johnsen, all the notes they exchanged, as well as Johnsen's written confessions. On September 4, Holland's jail cell was searched; all of Johnsen's notes, including his confessions, and Holland's handwritten copies were confiscated and booked into evidence. Holland had originally prepared "word for word" copies of Johnsen's notes so he could show Antone the useful information contained therein without handing over Johnsen's actual confessions until he received a deal.

Before trial, Johnsen moved to suppress Holland's testimony, alleging that Holland was a government agent under Antone's direction and elicited inculpatory statements from Johnsen about his arraigned offenses in violation of the Sixth Amendment. During the suppression hearing, the court asked Holland if "anyone from law enforcement t[old him] to continue to gather information from [Johnsen]." Holland replied: "Never." Holland emphasized, "No one ever asked me to get information on anything. I did this all on my own."

In the end, the court observed, "Antone indicated he was interested" in what Holland had to share regarding Johnsen's case, but he never "instruct[ed] [Holland] to elicit the information" and he never promised anything in return. Finding that neither of Holland's meetings with Antone on June 26 and July 3 rendered him a government agent under the Sixth Amendment, the court denied Johnsen's motion to suppress. Given their comprehensive detail, Holland's testimony and the incriminating notes Johnsen prepared became the cornerstone of the prosecution's case. After trial, the district attorney

arranged for Holland's state sentence to run concurrently with his federal sentence.

### 2. *Discussion*

The Sixth Amendment to the United States Constitution guarantees the assistance of counsel during all stages of a criminal prosecution. In *Massiah v. United States* (1964) 377 U.S. 201, the high court held that once a defendant has been charged with any crime, any "government agent[]" who elicits incriminating statements from a defendant regarding that crime outside the presence of counsel violates this protection. (*Id.* at p. 206.) Statements made under such conditions "are inadmissible at a trial on the charges to which the statements pertain." (*People v. Dement* (2011) 53 Cal.4th 1, 33, overruled on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192.) This prohibition on government agents applies equally to law enforcement officers and private persons enlisted by the government to elicit incriminating statements. "[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459.)

"A trial court's ruling on a motion to suppress informant testimony is essentially a factual determination, entitled to deferential review on appeal." (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 67 (*Coffman*).) To prevail, Johnsen must show " 'that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements.' " (*Ibid.*; see *In re Wilson* (1992) 3 Cal.4th 945, 950.)

"Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government." (*In re Neely* (1993) 6 Cal.4th 901, 915 (*Neely*).)

Johnsen argues that the court erred in denying his motion to suppress Holland's testimony. He claims that Holland was acting as a government agent as early as his June 26 meeting with Antone and thus the Sixth Amendment demands suppression of any information Holland exacted from Johnsen, including his 14-page signed, written confession. There is no question that Holland " 'deliberately elicited incriminating statements' " (*Coffman*, *supra*, 34 Cal.4th at p. 67) from Johnsen, so the merits of Johnsen's claim turn on whether Holland was in fact acting as a government agent when he elicited Johnsen's confession. We conclude he was not.

"Where the informant is a jailhouse inmate, the [agent prong of the] test is not met where law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance." (*Neely*, *supra*, 6 Cal.4th at p. 915.) Although Johnsen argues that Antone encouraged Holland to elicit more incriminating information, his argument has no basis in the record before us. Holland testified that he primarily told his attorney about Johnsen's confessions because he was worried that Johnsen would avoid prosecution and continue to murder others, not because of any desire to negotiate a more lenient sentence for himself. During his June 26 meeting with Antone, Holland was repeatedly informed that the district attorney would accept any useful information Holland had to offer about Johnsen's case but would not make any promises of

leniency. (*People v. Williams* (1988) 44 Cal.3d 1127, 1141 ["a general policy of encouraging inmates to provide useful information does not transform them into government agents"].)

While it is clear that early on Holland recognized Johnsen's confessions were sufficiently valuable that they could be leveraged into some deal, Holland also understood he was eliciting Johnsen's confessions "on [his] own" initiative without external direction, guidance, or encouragement. Holland acknowledged this when he told Antone, "I do this on my own," and again when he testified in court, "I did this all on my own." (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1247 ["If an informant 'acts on his own initiative,' even if he interrogates the accused, 'the government may not be said to have deliberately elicited the statements.' "].) In addition, after each meeting with Antone, Holland signed a form clarifying that Holland received nothing in return for his disclosures. And unlike a repeat informant, Holland had never given authorities information about another inmate, so there is no indication that Holland was working under a preexisting agreement or continuing practice of collaboration with law enforcement. (See, e.g., *United States v. Henry* (1980) 447 U.S. 264, 270, fn. 7.)

As the trial court acknowledged, Holland was likely motivated in part by "some self-interest . . . in working a deal for himself." Likewise, Antone's instruction that Holland should not consider himself a police agent "can be deemed as self-serving." For this reason, Antone's statements that Holland acted on his own do not, by themselves, establish that no agency relationship existed. (See *Coffman, supra,* 34 Cal.4th at p. 67 [noting that a preexisting agreement "need not be explicit or formal"]; Rest.3d Agency, § 1.02 com. a, p. 50 ["Although agency is a consensual relationship, how the parties to any given

42

relationship label it is not dispositive. Nor does party characterization or nonlegal usage control whether an agent has an agency relationship . . . ."].) Rather, we take into account the totality of the circumstances, including the possibility that attempts to disclaim agency may be self-serving. The trial court considered this possibility and weighed it against Holland's "testimony and demeanor," which suggested he was "ethically motivated." The court also noted that an agency theory appeared inconsistent with Holland's refusal to "give [Antone] the information" and the need "to serve a search warrant to get it." The court reasonably concluded that "based on the totality of the circumstances in this case" and "focusing on the state's conduct as a whole," Holland did not act as a government agent.

The fact that Holland ultimately received leniency in return for the information he elicited did not transform him into a government agent because the district attorney did not offer a leniency deal or even say a deal was in the works until September, months after Johnsen had made his incriminating statements to Holland. Although the district attorney did appear to be back-channeling with other prosecutors' offices to work out a potential deal, there is no evidence that Holland was aware of such discussions aside from Antone's brief comment that a deal of that magnitude would require significant coordination between various district attorneys' offices. We conclude Holland was not acting as a government agent and that the court did not err when it admitted Holland's testimony about Johnsen's incriminating statements pertaining to his crimes at Rudy's home.

In addition, Johnsen challenges Holland's efforts to elicit inculpatory statements regarding his role in Holloway's death. This claim also lacks merit. At the time Holland elicited these

incriminating statements, Johnsen had not been charged with or arraigned on any crimes associated with Holloway's death. The Sixth Amendment protects a defendant's right to counsel on arraigned charges, not unarraigned offenses. (*Kirby v. Illinois* (1972) 406 U.S. 682, 688–689.) Even assuming the Sixth Amendment applied, we find no violation. As discussed, Holland elicited all of the incriminating information about Holloway's death from Johnsen on his own accord as a private citizen, not as a government agent.

## III. GUILT PHASE

### A. Alleged Instructional Errors

Johnsen argues the trial court committed reversible error by failing to instruct the jury sua sponte on various jury instructions with respect to Landrum's testimony. In particular, Johnsen asserts that because Landrum was an accomplice to Johnsen's crimes, the trial court should have advised the jury with CALJIC No. 3.10 [definition of accomplice]; CALJIC No. 3.11 [corroboration requirement]; CALJIC No. 3.18 [accomplice testimony should be viewed with distrust]; and CALJIC No. 8.83.3 [corroboration requirement for special circumstances]. He also challenges the court's decision to grant defense counsel's request for the jury to be instructed with CALJIC No. 2.11.5 [limitation on discussing why coparticipant is not being prosecuted] as well as the court's refusal to give certain special instructions. According to Johnsen, these instructional errors violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution; article I, sections 7, 15, and 16 of the California Constitution; and California law.

## 1. *Accomplice Testimony and Corroboration*

Section 1111 bars any conviction predicated on "testimony of an accomplice unless it [is] corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid*.) "To be chargeable with an identical offense, a witness must be considered a principal under section 31." (*People v. Lewis* (2001) 26 Cal.4th 334, 368–369 (*Lewis*); see § 31 [defining "principal"].) In other words, there must be evidence of that person's "guilt . . . based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117, italics omitted.)

Only when there is "substantial evidence that a witness who has implicated the defendant was an accomplice" must the trial court instruct on "the principles regarding accomplice testimony." (*People v. Houston* (2012) 54 Cal.4th 1186, 1223; see *Lewis*, *supra*, 26 Cal.4th at p. 369 ["Substantial evidence is 'evidence sufficient to "deserve consideration by the jury." ' "].) " 'But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 302.)

The Attorney General contends there is minimal evidence Landrum aided and abetted Johnsen's offenses. According to the Attorney General, Landrum was merely an accessory to Johnsen's crimes — i.e., a "person who, after a felony has been

45

committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof . . . ." (§ 32.) Because an accessory is not "liable to prosecution for the identical offense charged against the defendant on trial," an accessory's testimony does not implicate section 1111. (§ 1111; see *People v. Horton* (1995) 11 Cal.4th 1068, 1113–1114.)

We agree that the trial court did not err by declining to give accomplice instructions. The trial evidence was overwhelmingly oriented toward the theory that Johnsen committed the crimes alone. As noted, the jury heard testimony that Landrum was at Johnsen's home the evening before the March 1 crimes and that Landrum drove to his mother's home around 9:00 p.m. and spent the night there. Landrum also explained how he came to briefly possess the property taken from Rudy's home — namely, Johnsen phoned him from the jail and told him to dispose of the stolen property, which Johnsen had stored in his own home. Landrum further testified that Johnsen tossed Rudy's key and a ball peen hammer out the car window on their drive to San Jose. He also disavowed participating in any of the crimes in Rudy's home, including the February burglary where Johnsen tried to enlist Landrum into stealing Rudy's television with him.

Lee also explained how Landrum's mother took possession of Rudy's stolen property after Johnsen frantically dropped off a paper bag with the stolen goods at Lee's apartment. The jury heard Thorne's testimony, in which he described notes from Johnsen instructing him to frame Landrum for the crimes at Rudy's home. Although Johnsen accused Landrum of

46

participating in his crimes at Rudy's home in his earliest two accounts to Holland, Johnsen later admitted that he was solely responsible. Most importantly, Johnsen's 14-page handwritten and signed confession was admitted into evidence alongside Holland's testimony that Johnsen eventually conceded that he had committed all of the crimes on his own.

In the end, the only evidence at trial that potentially connected Landrum to the March 1 crimes were Johnsen's earliest statements to Holland attempting to frame Landrum, which he later retracted, and conflicting witness testimony about whether Landrum had a bandage on his hand on March 1. Landrum testified against Johnsen pursuant to a grant of immunity on these accessory offenses. He was never charged or convicted of any principal offenses associated with the crimes that took place in Rudy's home. We therefore conclude that Johnsen's claim that the court failed to instruct the jury to view Landrum's testimony with skepticism lacks merit.

### 2. CALJIC No. 2.11.5 and Special Jury Instruction No. 28

Before trial, Johnsen's counsel moved to have the jury instructed on CALJIC No. 2.11.5 and special instruction No. 28. CALJIC No. 2.11.5 advises the jury to neither discuss nor consider why other individuals are not also being prosecuted. special instruction No. 28 would have modified CALJIC No. 2.11.5 to "permit the jurors to consider evidence of 'the guilt of any other person' in determining whether there was reasonable doubt of the appellant's guilt." At the time of Johnsen's request, the court briefly considered the special instruction in conjunction with CALJIC No. 2.11.5 and observed that the relevance of the special instruction would depend on how Johnsen presented his theory of the case. Accordingly, the court

placed the special instruction in its "possible" file for consideration "[d]epending on how the argument goes."

After closing arguments, the court instructed the jury using the unmodified version of CALJIC No. 2.11.5 at the request of Johnsen's counsel. Johnsen did not reintroduce his request for special instruction No. 28, and the court did not revisit it or rule on it one way or another. The court scribbled on the special instruction that it had been "[g]iven elsewhere." On appeal, Johnsen now contends that the trial court erred both by providing CALJIC No. 2.11.5 and by refusing to provide special instruction No. 28.

Johnsen begins by arguing that he did not forfeit his CALJIC No. 2.11.5 claim by requesting the instruction and by not asking the court to limit its application. Even assuming Johnsen's argument was not forfeited, we find that the instruction was not erroneous. It is well established that CALJIC No. 2.11.5 "should be clarified or not given when a nonprosecuted participant testifies at trial." (*People v. Crew* (2003) 31 Cal.4th 822, 845 (*Crew*).) Whether a person " 'was or may have been involved in the crime[s]' for the purposes of CALJIC No. 2.11.5 is a 'separate issue' [citation] from . . . whether [he or she] was an accomplice." (*People v. Williams* (1997) 16 Cal.4th 153, 226.) On the other hand, this instruction "is not error when it is given together with other instructions that assist the jury in assessing the credibility of witnesses." (*Crew*, at p. 845)

The Attorney General observes that in *Crew*, we upheld a conviction where the jury was instructed with CALJIC No. 2.11.5 because the jury also received instructions to consider "any evidence of witness credibility, including the existence or

nonexistence of a bias, interest, or other motive (CALJIC No. 2.20), and to consider the instructions as a whole (CALJIC No. 1.01)." (*Crew*, *supra*, 31 Cal.4th at p. 845.) Further, during closing arguments in *Crew*, defense counsel raised the unprosecuted coparticipant's immunity agreement as a ground to discount his testimony. (*Ibid.*) Given these considerations, we concluded in *Crew* that the trial court's inclusion of CALJIC No. 2.11.5 was not error.

Similar circumstances were present here. Not only was the jury advised with both CALJIC No. 2.20 and CALJIC No. 1.01, but Johnsen's counsel also warned the jury during closing arguments that "Mr. Landrum has been given immunity from prosecution for stolen property and drug offenses. This is some evidence of motive of bias to testify in this case." Moreover, the defense's case largely rested on the theory that Landrum, not Johnsen, committed the crimes at Rudy's home. Central to this theory were Johnsen's efforts to show Landrum's mother was Landrum's only alibi the night of February 29 and the morning of March 1, and that he variously handled the goods taken from Rudy's home. At the same time, the defense sought to undermine Landrum's credibility by (1) arguing his testimony was unreliable because he had ingested "crank" the night before and (2) introducing testimony that Landrum had a bandaged wound on his hand during the Johnsens' move on March 1. As a result, notwithstanding CALJIC No. 2.11.5, the jury received other instructions to assist them in evaluating Landrum's credibility as a nonprosecuted coparticipant. Consequently, Johnsen's claim lacks merit.

Johnsen has also failed to establish instructional error with respect to special instruction No. 28. There is no precedent that compels the trial court to instruct the jury specifically on

the reasonable doubt standard in the context of third party culpability when the jury has already received a general instruction on the reasonable doubt standard. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 825 ["because the jury could have acquitted defendant had it believed that a third party was responsible for [the victim's] death, no third party culpability instruction was necessary"].)

### 3. *Special Jury Instruction No. 14*

Johnsen also challenges the court's denial of related defense-requested instructions, which he asserts "were necessary to guide the jury's consideration of Landrum's testimony" and of third party culpability.

Special instruction No 14 read: "The testimony of a witness who provides evidence against a defendant for immunity from punishment, or for any other personal advantage, must be examined to determine whether this testimony has been affected by the grant of immunity, by personal interest, by expectation of reward, or by prejudice against the defendant." In denying special instruction No. 14, the court found that it would be duplicative of CALJIC No. 2.20. As noted, CALJIC No. 2.20 permits the jury to consider any evidence of witness credibility, including "[t]he existence or nonexistence of a bias, interest, or other motive." (CALJIC No. 2.20.) The Attorney General reiterates special instruction No. 14 would have been redundant. We agree. Having been instructed with CALJIC No. 2.20, the jury was already aware that it could consider any "bias, interest, or other motive" in assessing witness credibility, including a grant of immunity.

Johnsen claims our reasoning in *People v. Hunter* (1989) 49 Cal.3d 957 supports his position. But in *Hunter*, we found no

error in the court's refusal to instruct the jury to view an immunized witness's testimony with " 'greater care and caution' than the 'testimony of an ordinary witness.' " (*Id.* at p. 976.) "No California authority supports [Johnsen's] contention that an immunized witness, unlike an informant, is so analogous to an accomplice that a trial court must, upon request, give cautionary instructions as to the trustworthiness of immunized witness testimony." (*Id.* at p. 977.)

## B. DNA Evidence Chain of Custody

Johnsen contends the trial court improperly rejected his motion to exclude the expert testimony of molecular biologist Julie Cooper. During trial, Cooper testified about her analysis of DNA extracted from hair found on pantyhose in Rudy's home. Before Cooper analyzed the hair, it was accidentally broken into two hair fragments at the Department of Justice's crime lab in Modesto. On appeal, Johnsen asserts the trial court abused its discretion by finding that the hair's chain of custody had been established with reasonable certainty.

### 1. Background

Several prosecution witnesses testified regarding the hair's chain of custody from its initial discovery until the point where the DNA analysis dissolved it. Detective Buehler first discovered a pair of pantyhose on an armchair in Rudy's living room. The pantyhose were delivered to the state Department of Justice's lab in Modesto. There, criminalist Dr. Richard Lynd discovered a single four-inch blond hair inside. Through microscopic analysis, Dr. Lynd concluded the hair came from a Caucasian person's head, which may have been Johnsen's, given similarities in color, length, texture, and microscopic characteristics. Dr. Lynd's analysis ruled out Juanita, Rudy,

and Landrum as possible sources of the hair. Later, the hair was brought to a Stockton lab, where it was analyzed. The criminalist sealed the hair in a plastic petri dish with tape and returned it to the Modesto lab.

On June 3, 1992, Dr. Lynd unsealed the petri dish to photograph the hair. While doing so, he found the hair "taped to the plastic container." In his efforts "to get [the hair] out," Dr. Lynd inadvertently "broke the hair in two pieces." He photographed the evidence on a slide and returned it to storage. Two weeks later, Dr. Lynd retrieved the evidence to take another round of photographs. He then "removed the hair from the slide, rinsed the mounting media off of the hair and packaged it for shipping for the DNA analysis." Dr. Lynd did not normally wear a mask, hairnet, or gloves while working.

On June 22, 1992, Detective Bill Grogan transported the hair evidence to Cellmark Diagnostics, a DNA testing lab. Cooper, a Cellmark molecular biologist, opened the container to find "two very fine blond hairs" and "nothing else." Cooper testified that she "did not examine both ends of both pieces of hair [with] more than just a quick glance," but she thought "at least one of those hairs did have an end which looked thicker and could have been a pulled root."

Three months later, Cooper again visually examined the hair. She noticed that the "[t]wo pieces of hair . . . looked like they had an end that breathed out a bit which, from my experience, I know that hairs usually with a root, that's the fatter end." She said she was simply making a lay observation because Cellmark is "not a hair analyzing laboratory." She clipped what appeared to be the fatter ends off the hair and placed them into a single tube for PCR analysis. This process

consumed the hair pieces altogether. As a result, the jury heard Cooper's testimony on the results of her DNA analysis, but the hair fragments were never admitted into evidence at trial.

Upon hearing Cooper's testimony, Johnsen's counsel did not move to strike her findings based on inadequate chain of custody or on any other ground. After hearing testimony on the hair's chain of custody, the court credited Dr. Lynd's explanation that he accidentally broke a single hair into two when extricating it from the tape as adequate justification for the two hair pieces. The court also noted that Cooper's subsequent impression that "there were two hairs [that] both had roots" was easily explained because her perception was based on mere visual observation that both hairs "looked like they had an end that breathed out a bit" without actually confirming that they were in fact root ends. The court accepted Cooper's assertion that she "never looked at [the hairs] closely." In the end, the court found there was only "bare speculation that it's not the same hair" and that the speculation should bear on the weight of the evidence, not admissibility.

### 2. Discussion

Johnsen argues that the apparent presence of root ends on both hairs is a "critical anomaly" and "indicat[es] that the hair evidence had been altered either by contamination or by substitution/addition of one or both of the hair fragments." The crux of Johnsen's claim is that it is factually impossible to break a single hair with one root end into two hairs each with root ends. Given this, Johnsen complains that the presence of two hairs each with root ends is clear evidence of tampering.

Although Johnsen's counsel expressed general concerns about the hair's chain of custody at trial, Johnsen never objected

to Cooper's testimony on the record before or after it was introduced. Thus, the Attorney General asserts, Johnsen's claim is forfeited. Johnsen concedes that the record does not show his counsel moved to strike Cooper's testimony at any point. Nevertheless, Johnsen asserts his trial counsel rendered ineffective assistance (1) by eliciting testimony from Cooper reiterating that Johnsen's DQ-Alpha type matched the blond hair found in the pantyhose and (2) by failing to have Cooper's testimony stricken altogether.

Even assuming Johnsen's claim is not forfeited, we reject it on the merits. We clarified in *People v. Riser* (1956) 47 Cal.2d 566 (*Riser*), that "the party relying on an expert analysis of demonstrative evidence must show that it is in fact the evidence found at the scene of the crime, and that between receipt and analysis there has been no substitution or tampering . . . ." (*Id.* at p. 580.) There, we "set[] forth the rules for establishing chain of custody: 'The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' " (*People v. Diaz* (1992) 3 Cal.4th 495, 559 (*Diaz*).)

The trial court acted within its discretion when it held the district attorney had properly accounted for the hair's chain of

custody and thus Cooper's testimony offered only "the barest speculation that there was tampering." (*Riser, supra*, 47 Cal.2d at p. 581.) By furnishing firsthand testimony from Dr. Lynd that he accidentally broke one hair into two pieces at the Modesto lab, the prosecution made "at least a prima facie showing that the evidence had not been tampered with," at least not in any way that could alter the subsequent forensic analysis. (*People v. Williams* (1989) 48 Cal.3d 1112, 1135.) Aside from Cooper's testimony that she may have seen two root ends, there is no evidence supporting Johnsen's theory that the hair was tampered with. The trial court properly held that testimony about the hair was admissible and that the discrepancies, if any, raised by Cooper's visual perception go to the weight of that evidence. (*Diaz, supra*, 3 Cal.4th at p. 559.)

## C. Alleged Error in Stating Reasonable Doubt Standard

Johnsen alleges that statements made by the prosecution and defense diluted the reasonable doubt standard and shifted the burden of proof to Johnsen. He complains that this error violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and corresponding rights in the state Constitution.

### 1. Background

In his opening argument, the district attorney recited the jury instruction defining reasonable doubt (CALJIC No. 2.90), and he then informed the jury:

> "[H]aving that definition which the Court will read to you in mind, you can see that reasonable doubt doesn't mean a mere possible doubt. It does not mean proof to an absolute certainly [sic] and it doesn't mean proof beyond a shadow of a doubt.

"I'm going to suggest to you that, based on this definition of reasonable doubt, if any one of you feels that he or she might have a reasonable doubt, he or she should be able to do three things.  One, they should be able to put the doubt into words; two, they should be able to point to something in the evidence that makes them have that doubt; and, three, that juror should be able to convince his or her fellow jurors that the doubt is reasonable.

"If you can't do all three of these things then I suggest to you, ladies and gentlemen, the doubt that you are contemplating is the imaginary or mere possible doubt that is referred to in the Court's instruction."

Johnsen's counsel did not object at the time to the prosecution's characterization of the reasonable doubt standard.

During closing argument, however, defense counsel directly confronted the prosecutor's opening comments:

"[The prosecutor] talked about a method to decide whether or not any doubt that you might have on any particular fact is reasonable.

"And I agree with the first two steps that he said to take, and that number one step is articulate the doubt.  If you have a doubt that you can talk about, if you can put it into words, if you can articulate it, it may be reasonable doubt.  If you can point to a particular piece of evidence to support that doubt and say, "I don't feel good about this evidence and it makes me doubt which it's offered to prove," those are two steps that you should do.

"However, [the prosecutor] is wrong on the third step.  You're not required and you don't need to be able to convince your fellow jurors regarding whether or not the doubt is reasonable.  Your job is not to convince others.  Your job is to deliberate.

56

Your job is to deliberate and decide in your own mind whether each piece of evidence is reasonable, whether it's unreasonable, what it means, what it doesn't mean. And if you have doubt, you're entitled to retain that doubt and to consider it a reasonable doubt, even though you cannot convince another juror or the rest of your fellow jurors about that particular issue.

. . .

"I can't articulate for you or I can't say for you what is reasonable and what is unreasonable but I think if you can state it in your mind, if you can talk about it to someone else and point to a piece of evidence that you think is crucial and critical to the prosecution's case that you have a doubt about, that creates in your mind a doubt which is reasonable, and you can talk about[,] then you have not been convinced beyond a reasonable doubt, to a moral certainty.

"It's not necessary, as I said before, it's not necessary that you're able to convince anybody else in this jury. Your duty is to deliberate, which means to discuss, listen with an open mind, state your opinion, listen to other people's opinions. But if you believe something to be such that it creates a doubt in your mind and you can't get rid of that doubt then you don't have to change your mind. You're entitled to maintain that opinion as long as you deliberate fairly."

During his rebuttal, the prosecutor clarified:

"Reasonable doubt is the burden of proof which the People shoulder. And the operative word is 'reasonable.' If you don't have any method of assessing whether or not any doubt that you have is reasonable or unreasonable, then the instruction is meaningless. The concept is useless.

"And you have to test the reasonableness of any doubt. And one of the ways you do that is to discuss any perceived doubt with your fellow jurors, put it into words, test it, and see if anybody else agrees with you that that is a reasonable doubt. That's how you test it. There's no other way to assess any doubt. There's no way to tell whether a doubt is fanciful, imaginary, or just a mere possible doubt."

After closing arguments, the court instructed the jury with CALJIC No 2.90. As given, the instruction provided:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt whether guilt is satisfactorily shown, the defendant is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving the defendant's guilt beyond a reasonable doubt.

"Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is the state of the case which, after the entire comparison and consideration of all the evidence, leaves the mind of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge."

The court also instructed the jury with CALJIC No. 17.40. As given, that instruction provided:

"The People and the defendant are entitled to the individual opinion of each juror.

"Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors.

58

"Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

### 2. *Discussion*

As an initial matter, the Attorney General argues that Johnsen forfeited his challenge to the alleged misconduct. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).) Johnsen did not object to the district attorney's characterization of the reasonable doubt standard. While failure to object would not forfeit his claim when doing so would have been futile or an admonition would be insufficient to cure the purported harm, the record does not suggest that a timely objection would be futile or insufficient. (*People v. Centeno* (2014) 60 Cal.4th 659, 674 (*Centeno*).) Thus, Johnsen has forfeited this challenge on appeal.

Johnsen claims that his counsel rendered ineffective assistance by failing to object. To demonstrate ineffective assistance of counsel, Johnsen "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) On direct appeal, a finding of deficient performance is warranted where "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

We have said that "the decision . . . whether to object to comments made by the prosecutor in closing argument is a highly tactical one." (*People v. Padilla* (1995) 11 Cal.4th 891, 942.) Instead of registering a contemporaneous objection, defense counsel appears to have made a tactical choice to undermine the prosecutor in his own closing remarks. In *Centeno*, we held that there was "no reasonable tactical purpose" for defense counsel's failure to object to the prosecutor's use of an improper hypothetical that was reasonably likely to have misled the jury regarding the reasonable doubt standard. (*Centeno, supra*, 60 Cal.4th at p. 676.) The prosecutor in *Centeno* mischaracterized the reasonable doubt standard for the first time during rebuttal arguments. By contrast, the prosecutor in this case made nearly identical misstatements during both his opening and rebuttal arguments. Defense counsel may have made a strategic decision to rely on the counterarguments he had already made during his closing statement rather than objecting to the prosecutor's rebuttal statements. Such a tactical choice was not objectively unreasonable under *Strickland, supra*, 466 U.S. 668.

Even assuming Johnsen did not forfeit the claim of prosecutorial misconduct, his allegations do not warrant reversal. To determine whether a prosecutor has committed reversible misconduct in this context, we examine (1) whether it was reasonably likely that the prosecutor's statements misled the jury on reasonable doubt and (2) whether there is "a

reasonable probability that the prosecutor's argument caused one or more jurors to convict defendant based on a lesser standard than proof beyond a reasonable doubt." (*Centeno, supra,* 60 Cal.4th at pp. 674, 677.)

We find that the prosecutor's statements were reasonably likely to mislead the jury. As to the prosecutor's statement that the reasonable doubt standard requires jurors "to point to something in the evidence that makes them have that doubt," we found a similar mischaracterization to be misconduct in *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*). There, the prosecutor "addressed the concept of reasonable doubt, stating: 'it must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, *you have to have a reason for this doubt. There has to be some evidence on which to base a doubt.*' " (*Id.* at p. 831, first italics added.) Over a defense objection, the court allowed the prosecutor to continue, at which point she informed the jury: " 'There must be *some evidence* from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' " (*Ibid.*, italics added by *Hill.*) While we observed those remarks were "somewhat ambiguous," (*ibid.*) we concluded that the prosecutor had engaged in misconduct because it was "reasonably likely" the jury understood this comment "to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt" (*id.* at p. 832). We ultimately reversed Hill's judgment due to a litany of misconduct, including error in diluting the reasonable doubt standard. (*Id.* at p. 815.)

Here, as in *Hill,* it is reasonable to construe the prosecutor's remarks — "[t]here has to be some evidence on which to base a doubt" — to preclude jurors from having reasonable doubt solely based on the insufficiency of the prosecution's evidence. (See *Hill, supra,* 17 Cal.4th at p. 832;

*People v. Young* (2005) 34 Cal.4th 1149, 1195–1196 [prosecutor "may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence' "].) The prosecutor's remarks also erroneously suggest that a juror is precluded from considering factors such as common sense and life experience to form a reasonable doubt. The fact that defense counsel not only did not object to the misstatement but affirmatively agreed with it heightened the likelihood that the misstatement misled the jury.

The prosecutor also misstated the law by advising the jury that in evaluating whether a perceived doubt is reasonable, a "juror should be able to convince his or her fellow jurors that the doubt is reasonable." It is misconduct to " 'attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " (*Hill, supra,* 17 Cal.4th at p. 829.) "Among the essential elements of the right to trial by jury are the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous." (*People v. Collins* (1976) 17 Cal.3d 687, 693, superseded by statute on another ground as stated in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.) Embedded in this right is the well-settled principle that a single juror may validly hold reasonable doubt even if all other jurors disagree. Under such a scenario, the jury has not reached a unanimous verdict, and the defendant may not be found guilty. (See *Ramos v. Louisiana* (2020) __ U.S. __, __ [140 S.Ct. 1390, 1395].) Thus, the prosecutor rendered an incorrect characterization of the reasonable doubt standard by suggesting that any single juror's personally held doubt cannot be "reasonable" unless at least he or she can persuade another juror. The Attorney General does not dispute that the prosecutor misstated the applicable legal standard.

Nevertheless, we conclude that it was not reasonably likely that the prosecutor's misstatements caused one or more jurors to convict Johnsen on a standard lower than beyond a reasonable doubt. The court provided the jury with correct instructions on reasonable doubt and directed the jury to follow these instructions in the event of any conflicting statements. The court began by instructing the jury with CALJIC No. 1.00, which provided in relevant part: "You must accept and follow the law as I state it to you, whether or not you agree with the law. If anything concerning the law said by the attorneys in their arguments or at any other time during the trial conflicts with my instructions on the law, you must follow my instructions." The court then instructed with CALJIC No. 2.90, which stated that "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved . . . . This presumption places upon the People the burden of proving the defendant's guilt beyond a reasonable doubt." This instruction clarified that Johnsen is presumed innocent until proven guilty and that the prosecutor had the sole obligation to present evidence of guilt beyond a reasonable doubt. The court also provided CALJIC No. 17.40, which stated that the parties "are entitled to the individual opinion of each juror," that each juror "must decide the case for yourself," and that no juror should "decide any question in a particular way because a majority of the jurors or any of them favor such a decision." With this instruction, each juror presumably understood that he or she was entitled to make his or her own assessment of reasonable doubt and that persuading "a majority of the jurors or any of them" is not necessary. Defense counsel also stressed to the jury: "[I]t's not necessary that you're able to convince anybody else in this jury," and "if you believe something to be such that

63

it creates a doubt in your mind and you can't get rid of that doubt then you don't have to change your mind. You're entitled to maintain that opinion as long as you deliberate fairly."

In addition to the prosecutorial misconduct claim, Johnsen alleges his counsel rendered ineffective assistance by agreeing with the prosecutor's assertion that jurors must be able to "point to something in the evidence" that supports their reasonable doubt. We need not decide whether the decision to agree with the prosecutor on this point was deficient because, even if it was, Johnsen was not prejudiced. (See *Strickland, supra,* 466 U.S. at p. 697 ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"].) Just as instructing with CALJIC Nos. 1.00, 2.90 and 17.40 mitigated any misimpression the prosecutor's misstatements of the reasonable doubt standard would have given, it likewise reduced any risk the jury would be misled by defense counsel's similar misstatements.

In sum, we find no reasonable probability that the prosecutor's or defense counsel's misstatements caused any jurors to convict Johnsen based on a lesser standard than proof beyond a reasonable doubt.

## IV. PENALTY PHASE

### A. Juror Misconduct

Johnsen claims Juror Y.P.'s out-of-court discussion with her priest on the Catholic Church's (the Church) position on capital punishment just before the penalty phase violated his rights under the First, Sixth, Eighth, and Fourteenth Amendments. He argues that the court (1) did not conduct an adequate investigation into Juror Y.P.'s misconduct and (2)

should have removed Juror Y.P. on its own motion because her misconduct biased her against Johnsen.

### 1. Background

On March 10, the court adjourned for a two-week break in advance of the penalty phase. Before dismissing the jury, the court said: "Remember it's your duty not to converse among yourselves or with anyone else . . . or to form or express any opinion thereon until the cause is finally submitted to you."

The next day, Juror Y.P. reached out to her Catholic priest over the phone. Leaving a voicemail, Juror Y.P. inquired whether it was a sin for Catholics to vote to impose the death penalty. The priest returned her call later that day and informed her that he had spoken to a different judge about her message. When Juror Y.P. reiterated her question, the priest replied that he would answer her question, but he advised her that she had a duty to disclose this conversation to the judge presiding over Johnsen's case. Juror Y.P. agreed to do so.

The priest then asked her whether the Church's views would change the way she felt about the case. She said no, she simply wanted to know the Church's views. He then told Juror Y.P. that voting for the death penalty was not a sin as the Church "do[es] believe in capital punishment." Shortly thereafter, Juror Y.P. called the court and spoke to the bailiff. According to the bailiff, Juror Y.P. said she had asked a priest about the death penalty and "the priest told her that the church's position was that it wasn't against the death penalty."

A few days later, the court, prosecutor, and defense counsel convened to discuss the juror's out-of-court conduct. The court noted that Juror Y.P. had violated her oath not to discuss any aspect of Johnsen's case with nonjurors. Then, with both

attorneys present, the court phoned Juror Y.P. During the call, Juror Y.P. stressed that she had not discussed any details about Johnsen's case with her priest. She said she simply inquired about the Church's position on capital punishment because she was "just curious to know if it was a sin." Despite her curiosity, Juror Y.P. insisted, "Even if [the priest] were to tell me yes, it is a sin, it doesn't mean I wouldn't [vote for the death penalty] or vice versa. I just wanted to know."

The court then gave the parties an opportunity to question Juror Y.P. They declined to do so. After ending the call with Juror Y.P., the court informed both parties, "[I] don't see any reason to do anything" about Juror Y.P.'s conduct. According to the court, Juror Y.P. "shouldn't have actually been talking about the death penalty, although we didn't really specifically tell them not to talk about the death penalty. But it does involve the case." Defense counsel observed, "I think it's technically a violation but I don't think there's much substance to it." In the end, neither party accepted the court's invitation "to bring a motion" to remove Juror Y.P. from the jury.

### 2. *Discussion*

The Attorney General argues that Johnsen forfeited his juror misconduct claims because he did not ask the court to conduct further inquiry, nor did he ask the court to remove Juror Y.P. However, the trial court has an independent "duty to conduct an investigation when the court possesses information that might constitute good cause to remove a juror . . . whether or not the defense requests an inquiry, and indeed . . . even if the defense objects to such an inquiry." (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) Thus, Johnsen's failure to object at trial

did not forfeit his claim that the court failed to adequately investigate alleged juror misconduct.

As for Johnsen's claim that the trial court erred by failing to remove Juror Y.P. on its own motion, we have held that a defendant forfeits such claims of prejudicial juror misconduct when defense counsel does not "propose additional questions [be asked of jurors], object to any juror's continued service, or request a mistrial on the ground of juror misconduct." (*People v. Foster* (2010) 50 Cal.4th 1301, 1341; see *People v. Holloway* (2004) 33 Cal.4th 96, 124.) Defense counsel declined the trial court's invitations to question Juror Y.P. and to bring a motion to remove Juror Y.P. from the jury. When the court informed the parties that it did not "see any reason to do anything" about Juror Y.P.'s conduct, defense counsel agreed. By failing to seek Juror Y.P.'s excusal or otherwise object to the court's course of action, Johnsen forfeited his claim that the court should have removed Juror Y.P. As discussed below, this claim also fails on the merits.

As to the merits, we first address whether the trial court conducted an adequate investigation into Juror Y.P.'s alleged misconduct. When a court becomes aware of possible juror misconduct, it must " ' " 'make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 941.) The nature of the court's inquiry may consist of a full hearing or informal questioning of the juror in the presence of counsel. (*People v. Fuiava* (2012) 53 Cal.4th 622, 712.) "The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion." (*People v. Seaton* (2001) 26 Cal.4th 598, 676.)

According to Johnsen, the trial court's inquiry was inadequate because the court did not ask "questions designed to probe the effect of the priest's information on Juror Y.P.'s ability to decide [Johnsen's] fate free from outside influence" and did not question Juror Y.P. in person.  As noted, in the presence of Johnsen's counsel and the prosecutor, the court asked Juror Y.P. about her conversation with her priest.  After hearing Juror Y.P.'s account, the court accepted her assertion that the Church's views had no effect on her assessment of Johnsen's case.  The court then took the precaution of inviting either party to move to remove Juror Y.P.  After both parties declined to do so, the court did not remove her on its own motion.  Implicit in the court's decision was a finding that Juror Y.P. had been forthright about her conversation and her statement that it would not affect her views of the case.  On this record, we have no basis to second-guess the trial court's credibility determination.

Nor did the court abuse its discretion by questioning Juror Y.P. telephonically.  The court opted for a telephonic inquiry to expeditiously determine whether Juror Y.P. had discussed the case before or after she had returned her verdict at the guilt phase.  As the prosecutor observed, the parties would have responded differently if Juror Y.P. had "talked to the priest during deliberations.  Then we have a whole different ball game.  Then the question becomes whether [Johnsen] wants to move for a mistrial or whether mistrial is an appropriate remedy or whether we can substitute an alternate, tell them to go back in and deliberate the guilt . . . ."  The court agreed that it could not leave this inquiry until the jurors returned from their two-week break.  Although an in-person examination may have been preferable, the court did not abuse its discretion by choosing to

conduct a telephonic inquiry to quickly determine the extent of Juror Y.P.'s out-of-court contact.

As for Johnsen's claim that the trial court erred by failing to remove Juror Y.P. on its own motion, we ask "whether there is any overt event or circumstance . . . which suggests a likelihood that one or more members of the jury were influenced by improper bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 294, italics omitted.) A finding of "juror misconduct 'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.' " (*In re Hitchings* (1993) 6 Cal.4th 97, 118.) The Attorney General contends that even assuming Juror Y.P. committed misconduct, "there is not a substantial likelihood that Juror Y.P. was biased on the issue of punishment." "[Juror] bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter* (1995) 9 Cal.4th 634, 653; see *People v. Nesler* (1997) 16 Cal.4th 561, 579 ["If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard."].) Our review "accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence," and we independently

69

examine the mixed question of "[w]hether prejudice arose from [the] juror misconduct." (*Nesler*, at p. 582.)

We agree with the Attorney General that, even assuming without deciding that there was misconduct, any attendant presumption of prejudice has been rebutted. As noted, Juror Y.P. asked her priest whether it would be a "sin" for her to vote for the death penalty. Her priest said the Church "believes in the death penalty," so it would not be sinful to vote for the death penalty. But the priest did not indicate it was *desirable* to vote for the death penalty in any given case, nor would a reasonable listener understand the priest's response to generally favor imposing capital punishment. Contrary to what Johnsen claims, Juror Y.P.'s question and her priest's reply did not "relieve" her of the personal burden of sentencing him to death. There is no evidence that the priest opined further on the death penalty or that any other discussion transpired. We cannot say that Juror Y.P.'s out-of-court contact with her priest was inherently and substantially likely to result in bias. (See *People v. Danks* (2004) 32 Cal.4th 269, 310–311 ["[W]e are unwilling to ascribe to any perceived stereotype that jurors who receive advice from Christian spiritual leaders, or are exposed to Biblical passages, per se suffer a diminished sense of responsibility for their penalty verdict, and are automatically rendered incapable of fairly evaluating the evidence and law before them."].)

Nor can we conclude on the record before us that it is substantially likely that Juror Y.P. was actually biased against Johnsen. Although we recognize that a juror's insistence that she is not biased against a defendant does not end the court's inquiry (see *Crawford v. United States* (1909) 212 U.S. 183, 196), the record shows that Juror Y.P. repeatedly clarified to her

priest and later to the court that the Church's views would have no effect on her assessment of Johnsen's case. Immediately after her conversation with her priest, Juror Y.P. informed the bailiff. The court credited Juror Y.P.'s assurances that "[e]ven if [my priest] were to tell me yes, it is a sin, it doesn't mean I wouldn't [vote for the death penalty] or vice versa. I just wanted to know." Juror Y.P. reiterated that the Church's position on the death penalty was "not going to change the way [she] feel[s]" about Johnsen's case. Nothing in her out-of-court conversation or her statements to the court suggested that she had prejudged the case before any penalty phase testimony had been introduced or that she was predisposed to one result over the other. Nor does the record indicate that Juror Y.P.'s ultimate vote would be motivated by her religion. In fact, her colloquy with the court conveyed the opposite.

This case is distinguishable from *Hill*, where we emphasized that "an appeal to religious authority in support of the death penalty is improper because it tends to diminish the jury's personal sense of responsibility for the verdict." (*Hill*, *supra*, 17 Cal.4th at pp. 836–837.) In reversing the defendant's conviction and death judgment, we made clear "that to ask the jury to consider biblical teachings when deliberating is patent misconduct." (*Id.* at p. 836, fn. 6.) Here, the record provides no basis to second-guess the trial court's finding that Juror Y.P.'s discussion with her priest would not influence her views on the case. Nor is there any indication that Juror Y.P. consulted or mentioned her religious views or the Church's position on the death penalty during jury deliberations.

In sum, the record does not show a reasonable likelihood that Juror Y.P. was biased against Johnsen.

### B. Victim Impact Evidence

#### 1. Evidence of Leo's Rehabilitation

Johnsen argues that penalty phase evidence presented on Leo's physical recovery exceeds the bounds of permissible victim impact evidence (*Payne v. Tennessee* (1991) 501 U.S. 808) and violates his rights under the Eighth and Fourteenth Amendments as well as state law. The crux of his claim is that "the rationale for victim impact evidence set forth in *Payne* simply does not justify permitting victim impact testimony for any crimes other than the capital crime" and that during the penalty phase "a defendant's moral culpability must be assessed on the basis of that [capital] crime alone." Johnsen asks us to narrowly construe "victim," to mean "capital victim" to the exclusion of impact testimony on Leo, a surviving victim of the murder-robbery. Johnsen acknowledges we have rejected similar arguments before. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1062–1063; *People v. Karis* (1988) 46 Cal.3d 612, 649.) Nevertheless, he asks us to reconsider these prior holdings.

We decline to do so. "Although victim impact is not expressly enumerated as a statutory aggravating factor, . . . such evidence [i]s generally admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Brown* (2004) 33 Cal.4th 382, 396 (*Brown*).) Johnsen's argument that victim impact evidence is exclusively limited only to impact evidence on the deceased victim is unavailing; the language of factor (a) is not so narrow. That provision authorizes consideration, at the penalty phase, of "[t]he *circumstances of the crime* of which the defendant was convicted in the present proceeding and . . . any special circumstances. . . ." (§ 190.3, factor (a), italics added.)

Leo's near-death injuries occurred alongside Juanita's murder while Johnsen was robbing them, a special circumstance found by the jury. According to Dr. Brown, the injuries Leo sustained during Johnsen's assault rendered him incapable of oral or written communication. Leo's adult children testified regarding their increased caregiving duties of Leo, directly attributable to Leo's injuries and the murder of their mother, Juanita, who would have otherwise cared for Leo.

Their victim impact testimony was also admissible during the penalty phase because it concerned the effect of Johnsen's violent crimes against Juanita on her family, including Leo. (See *People v. Davis* (2009) 46 Cal.4th 539, 618; *People v. Taylor* (2001) 26 Cal.4th 1155, 1171–1172.) Finally, the testimony regarding Leo's rehabilitation was not "so voluminous or inflammatory as to divert the jury's attention from its proper role or invite an irrational response" in violation of due process. (*Taylor*, at p. 1172; see *People v. Roldan* (2005) 35 Cal.4th 646, 731.)

### 2. Alleged Instructional Error

Johnsen argues that the trial court erred in denying two defense-requested jury instructions pertaining to the victim impact evidence. Johnsen's proposed penalty phase instruction No. 35 read:

> "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional

evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy."

The court declined to instruct the jury to this effect, characterizing the proposed instruction as "unnecessary." In *People v. Russell* (2010) 50 Cal.4th 1228, we found no error in the trial court's refusal to give an identical jury instruction to the one at issue here because it was confusing and because other instructions already advised the jury to determine the facts and apply the law as directed. (*Id.* at p. 1265 & fn. 6.) As in *Russell*, we conclude the trial court here did not err in refusing to instruct the jury with proposed instruction No. 35.

The court also refused defendant's penalty phase instruction No. 61, which the court opined was an incorrect statement of law. That instruction would have provided: "The facts of this case may arouse in you a natural sympathy for the victim or the victim's family. Such sympathy, while natural, is not relevant to the penalty decision in this case. [¶] You are to base your decision on the evidence, the arguments of counsel, and the law stated in these instructions. You are directed not to consider any feelings of sympathy you may feel for the parties injured or aggrieved in this case." During the penalty phase, however, "the jury may exercise sympathy for the defendant's murder victims and for their bereaved family members" in aggravation, as a circumstance of the crime. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195; see § 190.3, factor (a).) The trial court was correct to deny this instruction, which erroneously stated that the jury must "not . . . consider any feelings of sympathy . . . for the parties injured or aggrieved."

### C. Admission of Photographs of Deceased Victim Theresa Holloway

Over an objection by Johnsen's counsel, the trial court admitted into evidence three postmortem photographs of different parts of Holloway's body. The three photos showed close-up shots of injuries to Holloway's face, neck, and scalp. Johnsen renews his argument that these photographs should have been excluded from the penalty phase as irrelevant and more prejudicial than probative. (Evid. Code, §§ 210, 352.)

Johnsen begins by disputing the relevance of the photos pursuant to section 190.3, factor (b). Factor (b) authorizes admission of evidence of Johnsen's unadjudicated violent criminal activity as a factor in aggravation during the penalty phase. Johnsen's primary argument is that photos of Holloway's bodily injuries are not relevant because Johnsen did not personally injure Holloway; thus, her injuries could not be indicative of Johnsen's state of mind when he aided and abetted her murder.

We have said that "[v]iolent 'criminal activity' presented in aggravation may be shown in context, so that the jury has full opportunity in deciding the appropriate penalty to determine its seriousness." (*People v. Melton* (1988) 44 Cal.3d 713, 757.) Here, the photos were not introduced to ascertain Johnsen's state of mind with respect Holloway's death but rather to convey to the jury the unusual context and circumstances of Johnsen's prior violent criminal activity, which the prosecution had to prove beyond a reasonable doubt. (§ 190.3, factor (b); see *People v. Robertson* (1982) 33 Cal.3d 21, 54.) Johnsen did not injure Holloway himself, but the other crime's evidence and Johnsen's written confession strongly suggest that he directed Jurado to

kill Holloway to prevent her from disclosing their plans to kill Mynatt.

Contrary to Johnsen's claim that the photographs were cumulative of other testimony, they did have probative value during the penalty phase. They rendered Johnsen's written confession more credible and enabled the pathologist to effectively communicate the peculiar nature of Holloway's injuries to the jury. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 423 [" '[a]utopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds' "].) In other words, the photos had a "tendency in reason to prove or disprove a[] disputed fact that is of consequence" (Evid. Code, § 210), and the court correctly concluded that they are relevant under Penal Code section 190.3, factor (b).

As to whether the photos were more prejudicial than probative, we are mindful that Evidence Code section 352 confers on the trial court "broad discretion" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124) to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (Evid. Code, § 352). Our review is limited to whether the trial court's determination under section 352 constituted an "abuse of discretion." (*Rodrigues*, at p. 1125.) Our intervention is only warranted when "the probative value of the photographs clearly is outweighed by their prejudicial effect." (*People v. Crittenden* (1994) 9 Cal.4th 83, 134.)

The trial court noted that the prosecution selected only three autopsy photos — each depicting a different injury point on Holloway's neck, face, and head — out of nearly 100 photos. While recognizing that in general photos of a deceased victim may provoke a visceral reaction, we have reviewed the challenged photos and conclude that the photos, while unpleasant, were not likely to evoke a visceral reaction disproportionate to the murder itself. Because the photos' probative value was not clearly outweighed by their prejudicial effect (Evid. Code, § 352), we conclude that the court did not abuse its discretion in admitting the photographs.

## D. Alleged Prosecutorial Misconduct

Johnsen contends the prosecutor committed multiple acts of prejudicial misconduct in his opening and closing argument during the penalty phase, requiring reversal. But Johnsen did not preserve his objection to much of the alleged misconduct, and in any event, his claims either lack merit or do not rise to the level of prejudicial misconduct.

"The same standard applicable to prosecutorial misconduct at the guilt phase is applicable at the penalty phase." (*People v. Valdez* (2004) 32 Cal.4th 73, 132 (*Valdez*); see *People v. Guerra* (2006) 37 Cal.4th 1067, 1153.) " ' "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 480 (*Sattiewhite*).) Johnsen raises no claims pursuant to the California Constitution, so we consider his federal claims alone.

### 1. Comments on Society and the Integrity of the Law

#### (a) Background

During his opening argument, the district attorney told the jury, "[Y]ou are representatives of 30 million Californians, the great majority of whom are law abiding citizens. You owe them and yourselves a conscientious, courageous and thorough review of the evidence in this phase of the trial. You owe yourselves and them the imposition of a just and appropriate punishment. [¶] I urge you to remain faithful to your oath and to do the right thing. Fellow citizens expect that you will discharge your duty and they are entitled to the discharge of that duty." The prosecutor also contextualized societal values, saying, "By subjecting certain murderers to death, society acknowledges the level of their evil and their depravity and the preciousness of the innocent lives which such murderers violently and prematurely ended." He observed that "[a] society which lacks the will to protect its citizens from the likes of the Brian Johnsens of the world, is as immoral as it is weak and criminally negligent. Fortunately we live in a society which has the courage and the will to confront evil and eradicate it."

Johnsen's counsel did not object to any of the prosecutor's remarks. Instead, defense counsel responded in his opening argument: "The prosecutor has asked you to return a death sentence and the message is if you vote for the death penalty, you're tough on crime; and if you vote for life without possibility of parole, well, then you're not tough on crime because you've got all these 30 million people behind you. [¶] Well, that's not true." Defense counsel said: "There's 12 people and they're all individuals. Each one of you are the ones who are responsible for making this decision. You don't have to worry about the 30 million people out there."

78

In rebuttal, the prosecutor told the jury: "You are here to apply the law of the State of California in a capital murder case and that law requires that you weigh the aggravating and mitigating circumstances in deciding whether to impose the penalty of death." "You will be voting for death to, one, maintain the integrity of the law, to insure that it works the way it has been designed to work. You will be voting for death to impose a just and an appropriate penalty."

Johnsen's counsel responded: "I think that Mr. Fontan [the prosecutor] is wrong when he says we have to kill Mr. Johnsen to maintain the integrity of the law. What we have to do to maintain the integrity of the law is do the right thing." "[K]illing Mr. Johnsen would certainly not make the system work better, make anybody have more respect for the system," defense counsel said. "The system will be in good shape, thank you, tomorrow and next week and next month and next year whether you kill Mr. Johnsen or whether you sentence him to life without possibility of parole."

Although Johnsen's counsel never objected to the prosecutor's remarks, he requested defendant's penalty phase instruction No. 60: "After weighing all the aggravating and mitigating factors, it is up to you individually to decide which of the punishments, life without parole or death, should be imposed in this case. You must always keep in mind that each of you bears the ultimate moral responsibility to determine the appropriate penalty under all the circumstances of this case." The district attorney opposed this request.

The court asked Johnsen's counsel if he would be satisfied if, instead of giving the requested instruction, the court modified CALJIC No. 8.88 to include the word "individually" so that it

would read: "To return a judgment of death, each of you *individually* must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Italics added.) Johnsen's counsel replied: "Well, all right. I think that's appropriate." The court instructed the jury accordingly.

*(b) Discussion*

On appeal, Johnsen contends that the prosecutor's reference to "[a] society which lacks the will to protect its citizens from the likes of the Brian Johnsens of the world, is as immoral as it is weak and criminally negligent" shamed jurors into favoring the death penalty to uphold social expectations rather than engaging in an " 'individualized inquiry' " of Johnsen as compelled by the Eighth Amendment. (*Romano v. Oklahoma* (1994) 512 U.S. 1, 7.)

To the extent Johnsen's claim of prosecutorial misconduct alleges a due process violation, he has forfeited it by failing to " ' "make a timely objection and ask the trial court to admonish the jury," ' " as there is no indication a timely objection would have been inadequate. (*Sattiewhite, supra*, 59 Cal.4th at p. 480.) However, his "failure to object at trial does not preclude him from raising . . . on appeal" a claim under *Caldwell v. Mississippi* (1985) 472 U.S. 320 (*Caldwell*). (*Sattiewhite*, at p. 481; see *Caldwell*, at pp. 328–329 [a verdict "made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere" violates the 8th Amend.].)

The prosecutor's remarks here did not run afoul of the Eighth Amendment. "It [i]s not improper for the prosecutor to

argue that the jury would be acting as the representative of the community or for society as a whole." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 149.) In *Sattiewhite*, we declined to find misconduct because the prosecutor "accurately described the jurors as the conscience of the community." (*Sattiewhite, supra,* 59 Cal.4th at p. 481; see *Caldwell, supra,* 472 U.S. at p. 333 [capital jury may be asked to decide penalty "on behalf of the community"].) Here, as in *Sattiewhite*, the prosecutor "did not urge the jury to abrogate their personal responsibility to determine the appropriate punishment" or "suggest to the jury that 'the responsibility for determining the appropriateness of the defendant's death rests elsewhere.'" (*Sattiewhite*, at p. 481.) The prosecutor merely told jurors that they "owe [them]selves and [others] the imposition of a just and appropriate punishment" and that a death verdict would be consistent with societal values. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1179 ["the community . . . has the right to express its values by imposing the severest punishment for the most aggravated crimes"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) And as in *Sattiewhite*, the court here instructed the jury to determine "individually" whether death is the appropriate penalty.

As for the district attorney's statement urging the jurors to "confront evil and eradicate it," the word "it" could have been understood by a reasonable juror to label Johnsen an "evil" that must be "eradicate[d]." "A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251.) The prosecutor's suggestion that Johnsen is "evil,"

followed by a call to "eradicate" such evil, borders on "inflammatory" rhetoric. (*Ibid.*; see *People v. Fosselman* (1983) 33 Cal.3d 572, 580 [a prosecutor may " 'use appropriate epithets warranted by the evidence,' " but "the prosecutor's inflammatory characterization of defendant" could not be condoned].) But the comment was limited and fleeting such that any error was nonprejudicial.

### 2. *Comments on Johnsen's Lack of Sympathy and Mercy*

During his opening argument, the district attorney asked the jury several rhetorical questions, including: (1) "Why should Brian Johnsen's life be spared when he failed to show any compassion or sympathy for his victims at the time he committed his murders?"; (2) "Why should a cold-blooded, cavalier, thrill-killer like Mr. Johnsen be permitted to live after killing twice and attempting to kill again?"; and (3) "Why should [Johnsen] live while the remains of his victims decay in the earth and their survivors are condemned to grieve the manner and tragedy of the death of their loved ones each and every day that they live?" Johnsen did not object to these comments, nor has he shown that a sustained objection and an admonition from the court would have been inadequate. (*Seumanu, supra*, 61 Cal.4th at p. 1328.) Thus, he has forfeited this claim on appeal.

We also reject it on the merits. Section 190.3, factor (k) permits penalty phase consideration of any "circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." "[R]emorse, which by definition can only be experienced after a crime's commission, is something commonly thought to lessen or excuse defendant's culpability." (*Brown v. Payton* (2005) 544 U.S. 133, 142–143.)

Contrary to Johnsen's arguments, the prosecutor did not attempt to turn Johnsen's lack of remorse or mercy for his victims into an aggravating factor. Rather, the rhetorical questions are most reasonably read to advise the jury that Johnsen's lack of compassion or sympathy weighs against mitigation. Although a prosecutor may not "argue that the absence of such mitigating factors [such as the lack of remorse] is itself an aggravating factor justifying the death penalty" (*People v. Dyer* (1988) 45 Cal.3d 26, 82, italics omitted), the prosecutor may argue "a particular mitigating circumstance, such as [Johnsen's] remorse for his victims, is lacking from the case" (*ibid.*) and may also "urge[ the jury] not to be swayed by arguments for sympathy" (*People v. Sanders* (1995) 11 Cal.4th 475, 554). Here, the district attorney pointed to Johnsen's lack of remorse or mercy for his victims, and urged the jury not to offer any sympathy. Such arguments opposing mitigation do not offend due process.

### 3. Comments on Conspiracy Evidence

Johnsen alleges the prosecutor's reference to Johnsen's participation in a conspiracy to kill Mynatt mischaracterized the section 190.3, factor (a) motive evidence behind Holloway's killing as a factor (b) violent criminal activity.

In his opening remarks, the district attorney asked the jury to "[t]hink about the motive. [Johnsen] decided to participate in [Holloway's] murder because she was going to go to the object of a plot he was involved with, a plot to kill another person. So we have a killer here . . . who not only premeditates and deliberates his killings, *we have a killer that kills so he can continue to kill*. That was his motive. *He had his girlfriend killed so he could kill Doug Mynatt*." (Italics added.) As noted,

the district attorney also introduced section 190.3, factor (a) motive evidence that Jurado, Shigemura, Humiston, and Johnsen killed Holloway because they were concerned that Holloway might tell Mynatt about Johnsen's plans to kill him. Johnsen claims that his confession to Holloway's murder disavowed any intent to kill Mynatt, instead evincing a fear that Mynatt would kill "all of [them]" if Holloway "ratted" them out. His confession stated, "I had no choice. It was her or all of us." Thus, Johnsen claims he never intended to kill Mynatt and observes Mynatt was never murdered. Because there was insufficient corroborating evidence to establish the conspiracy under factor (b), Johnsen argues that the prosecutor's remarks transformed his unproven conspiracy crime into a standalone aggravating factor in violation of due process.

We conclude Johnsen's claim lacks merit. Both parties are entitled to " ' "fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Ward* (2005) 36 Cal.4th 186, 215.) " ' "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' " (*Valdez, supra,* 32 Cal.4th at p. 134.) The prosecutor's theory that Johnsen's motive for killing Holloway to conceal a plot to kill Mynatt was a "reasonable inference" based on the evidence presented. Importantly, the court instructed the jury that it could consider "[e]vidence regarding a plot to kill a Doug Mynatt . . . only to establish the motive for the murder of Terry Holloway." Johnsen does not demonstrate how the court's admonishment was insufficient to prevent the jury from misinterpreting or misapplying the motive evidence pertaining to Holloway's killing. Accordingly, Johnsen's misconduct claim fails.

### E. Cumulative Error

Johnsen asserts that the combined errors during the guilt and penalty phase warrant reversal of his conviction, his death sentence, or both. During the guilt phase, we found error with respect to the prosecutor's misstatement of the reasonable doubt standard. (*Ante,* at pp. 59–64.) At the penalty phase, we have acknowledged the prosecutor's potentially inflammatory comment about Johnsen during penalty phase arguments. (*Ante,* at pp. 81–82.) We conclude that their cumulative effect does not rise to the level of prejudice necessary to reverse Johnsen's conviction or his sentence.

### F. Challenges to the Death Penalty

Johnsen raises myriad challenges to the constitutionality of California's death penalty regime. While he acknowledges we have consistently found similar claims to be meritless, he nevertheless asks us to reconsider our precedent. We decline to do so.

Johnsen contends his conviction and sentence are invalid because state judges are subject to direct elections, retention elections, or both. Pointing to the 1986 election where California voters declined to retain three high court judges ostensibly due to their views disfavoring the death penalty, Johnsen argues political disincentives to "make defense-favorable rulings in capital cases" result in a "tilted system." Although Johnsen is certainly entitled to "impartial" judges, he "is not . . . entitled to have his appeal decided by justices who have never formed or expressed opinions or thoughts on general topics such as the propriety of the death penalty." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1140 (*Kipp*); see *People v. Prince* (2007) 40 Cal.4th 1179, 1299; *People v. Avila* (2006) 38 Cal.4th 491, 615 ["This

court's review process is not impermissibly influenced by political considerations."].)  Even if judicial elections were a conflict of interest, they "would apply equally to all California judges and, under the common law rule of necessity, the justices of this court [and our lower courts] would not be disqualified." (*Kipp*, *supra*, at p. 1141.)

Section 190.3, factor (a), which allows the jury to consider the individualized circumstances of the capital offense, does not result in arbitrary or capricious imposition of the death penalty. (*Brown*, *supra*, 33 Cal.4th at p. 401.)  On the contrary, section 190.3, factor (a) guarantees "each case is judged on its facts, each defendant on the particulars of his offense." (*Brown*, at p. 401.)

We have previously held that the jury is not required to unanimously agree on:  (1) which circumstances of the crime are aggravating; (2) whether Johnsen engaged in prior violent criminal activity under section 190.3, factor(b); (3) whether Johnsen committed a prior felony under section 190.3, factor (c); and (4) which sentencing factors were aggravating. (*People v. Bunyard* (2009) 45 Cal.4th 836, 860–861; see also *Brown*, *supra*, 33 Cal.4th at p. 402; *People v. O'Malley* (2016) 62 Cal.4th 944, 1014 (*O'Malley*).)

Johnsen asserts it is unconstitutional to allow the same jury that convicted him to decide whether he also committed other criminal activity.  We have concluded otherwise. (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 76–77.) "[D]ue process does not preclude the consideration of this type of evidence by a penalty jury [that] has found the defendant guilty of murder," and "the strong legislative preference for a unitary jury outweighs any 'supposed disadvantage' to defendant in the

single-jury process." (*People v. Balderas* (1985) 41 Cal.3d 144, 204.)

Johnsen also complains that section 190.3 factor (i), which requires the sentence to consider the defendant's age at the time of the offense, is unconstitutionally vague. We have held that "[t]he use of defendant's age as a sentencing factor [citation] is not impermissibly vague under the Eighth Amendment." (*O'Malley*, *supra*, 62 Cal.4th at p. 1013.)

Johnsen raises several objections to CALJIC No. 8.85, all of which we have denied previously, and we again deny them here. "The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors . . . ." (*People v. Mitchell* (2019) 7 Cal.5th 561, 589 (*Mitchell*).) Nor must the court advise the jury which factors to consider aggravating or mitigating, as "[t]he aggravating or mitigating nature of the factors is self-evident within the context of each case." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 509.) "The use of certain adjectives such as 'extreme' and 'substantial' in the list of mitigating factors in section 190.3 does not render the statute unconstitutional." (*People v. Thompson* (2010) 49 Cal.4th 79, 144.) And the court need not specify a burden of proof for aggravating or mitigating sentencing factors. (*People v. Jackson* (2014) 58 Cal.4th 724, 773.)

We have previously held that "neither the cruel and unusual punishment clause of the Eighth Amendment, nor the due process clause of the Fourteenth Amendment, requires a jury to find beyond a reasonable doubt that aggravating circumstances exist or that aggravating circumstances outweigh mitigating circumstances or that death is the appropriate penalty." (*People v. Blair* (2005) 36 Cal.4th 686, 753.) Johnsen

asserts that the failure to require written jury findings is unconstitutional, but "[j]urors need not make written findings in determining penalty." (*People v. Valdez* (2012) 55 Cal.4th 82, 180.)

Johnsen challenges CALJIC No. 8.88, but "[w]e repeatedly have rejected identical claims . . . ." (*People v. Catlin* (2001) 26 Cal.4th 81, 174.) "The court's use of CALJIC No. 8.88, which instructs that jurors must be 'persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances' to warrant a death judgment, is not unconstitutionally vague, appropriately informs jurors, and does not violate the Eighth and Fourteenth Amendments to the federal Constitution." (*Mitchell, supra,* 7 Cal.5th at p. 589.) "CALJIC No. 8.88 does not misstate the law by asking jurors whether the circumstances 'warrant[]' death . . . ." (*People v. Manibusan* (2013) 58 Cal.4th 40, 100.) "The trial court need not instruct jurors that . . . they should impose life imprisonment without the possibility of parole if they find that the mitigating circumstances outweigh the aggravating circumstances." (*People v. Valdez, supra,* 55 Cal.4th at pp. 179–180.) "CALJIC No. 8.88 is not constitutionally defective for failing to inform the jury that is has the discretion to impose a sentence of life without the possibility of parole even in the absence of mitigating circumstances." (*People v. Linton* (2013) 56 Cal.4th 1146, 1211.) Likewise, we decline to revisit our precedent holding that "[t]he jury is not required to unanimously find that certain aggravating factors warrant the death penalty under the federal Constitution, and the equal protection clause does not compel a different result." (*Mitchell,* at p. 588.)

Contrary to Johnsen's contention that California law fails to meaningfully narrow the pool of all those convicted of murder

for death penalty eligibility, section 190.2 "adequately performs the constitutionally mandated narrowing function." (*People v. D'Arcy* (2010) 48 Cal.4th 257, 308.) "Our state death penalty statute is not unconstitutional for failing to require intercase proportionality review or disparate sentence review." (*People v. Eubanks* (2011) 53 Cal.4th 110, 154.) "California's use of the death penalty does not violate international law, the federal Constitution, or the Eighth Amendment's prohibition against cruel and unusual punishment in light of 'evolving standards of decency.' " (*Mitchell, supra*, 7 Cal.5th at p. 590.)

## CONCLUSION

We affirm the judgment.

LIU, J.

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**IKOLA, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Johnsen

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S040704
**Date Filed:** February 1, 2021

_____

**Court:** Superior
**County:** Stanislaus
**Judge:** David G. Vander Wall


_____

**Counsel:**

Neoma Kenwood, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ryan B. McCarroll and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Neoma Kenwood
1569 Solano Avenue
Berkeley, CA 94707
(510) 528-4775

A. Kay Lauterbach
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 210-7671